[No. A061818. First Dist., Div. Three. June 20, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
AUGUSTINE VENEGAS, Defendant and Appellant.

[No. A063917. First Dist., Div. Three. June 20, 1994.]

In re AUGUSTINE VENEGAS on Habeas Corpus.

## Counsel

Leo Paoli, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and René A. Chacón, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

CHIN, J.—Augustine Venegas (hereafter appellant) appeals after a jury conviction of possessing a weapon in state prison. (Pen. Code, former § 4502 [now § 4502, subd. (a)].)[1] He claims that the trial court erred in denying his motion for change of venue and that he received ineffective assistance of counsel. In a consolidated petition for writ of habeas corpus, he challenges his sentence. The court imposed a full four-year upper term "consecutive to any and all other sentences [appellant] is now serving," including a 1986 term appellant received for another offense he committed in prison. Appellant contends that, pursuant to section 1170.1, subdivisions (a) and (c) (hereafter sections 1170.1(a) and 1170.1(c) respectively), the court instead should have imposed a sentence of one-third of the middle term. We affirm the conviction, but grant the petition for a writ of habeas corpus and remand for resentencing.

### Facts

On August 17, 1992, Pelican Bay Prison Correctional Officer Mike Armstrong was in a control booth, releasing prisoners for breakfast. Another officer yelled, and Armstrong heard a scuffle begin in the other officer's area. Shortly afterward, Armstrong saw an inmate named Cost "backtailing across the rotunda." Appellant was charging at Cost, forcing Cost back. Armstrong saw appellant make punching-type motions at Cost with both hands and then saw a large amount of blood coming from Cost's face. Armstrong ordered both inmates to get down on the floor, and they complied. Appellant, however, then "scooted backwards up against the wall." Armstrong saw him stuff something into a paper trash bag. As additional officers entered, appellant said, "[Y]ou didn't see me do shit."

An officer moved the bag out of appellant's reach. At Armstrong's direction, Sergeant Don James then searched the bag, finding two weapons:

---

[1] All further statutory references are to the Penal Code.

a slashing-type weapon made out of a razor blade and melted plastic, and a stabbing-type weapon made entirely of melted plastic. James found Cost bleeding from "an incised-type wound"—a slashing injury—on the face.

The defense called inmate Melchor Llamas, who testified that, when the fight broke out, appellant and he ran to "a secure place where we thought we wouldn't get involved in it, and that's when they told us to get down and we laid down on the floor." Llamas saw no weapons.

## DISCUSSION

### I. *Change of Venue Motion*

█ Appellant moved before trial for a change of venue, alleging that he could not receive a fair trial in Del Norte County because of widespread and ingrained prejudices in the population of prospective jurors against Pelican Bay inmates—attitudes that a public opinion survey assertedly demonstrated. According to the survey, 60.7 percent of the respondents believed that "a Pelican Bay Prison inmate is inherently more dangerous to other inmates than a Del Norte County Jail inmate"; 62 percent believed that Pelican Bay inmates are "very violent" or "extremely violent"; and 82.5 percent agreed with the statement, "Pelican Bay Prison inmates are not to be trusted." The parties stipulated that the population of Del Norte County was 27,300; that there were approximately 3,900 inmates at Pelican Bay; and that there were approximately 1,200 employees at Pelican Bay. The court denied the motion without prejudice to its renewal if jury selection proved difficult or revealed a large number of biased potential jurors.

At voir dire, the court examined prospective jurors on their ability to judge the testimony of law enforcement officers and inmates and to judge a case involving a crime committed in state prison, and excused several who admitted that they might not be impartial. During jury selection, appellant renewed his change of venue motion, which the court again denied.

█ A court must grant a change of venue "when the defendant shows a reasonable likelihood that, in the absence of such relief, a fair trial cannot be had. The court considers such factors as the nature and gravity of the offense, the size of the community, the status of the defendant, the popularity and prominence of the victim, and the nature and extent of the publicity. On appeal after a judgment following the denial of a change of venue, the defendant must show both that the court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it

was reasonably likely that a fair trial was not in fact had." (*People* v. *Edwards* (1991) 54 Cal.3d 787, 806-807 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

■ Unlike the usual change of venue motion, which focuses on the notoriety of a particular defendant or crime in the community, appellant's challenge here focused on the fairness of trying *any* Pelican Bay inmate in Del Norte County for an in-prison offense. As counsel said, "we are basing this motion not upon the traditional pretrial publicity, but upon the fact that the entire county is prejudiced and biased against Pelican Bay inmates." Appellant cited no features that were unique either to his crime or himself. The question, therefore, is whether appellant, through his survey, has shown a reasonable likelihood that trial of a Pelican Bay prisoner in Del Norte County is inherently and necessarily unfair.

We agree with the trial court that appellant made no such showing. First, as the court noted, the survey provides no "comparison with what a defendant would face if he were in a different county. In other words, there is no indication that people in other counties are any more kindly disposed to state prison inmates than they are" in Del Norte County. Appellant argues that this reasoning was erroneous, as "there is no requirement that a defendant make a showing that some other county would provide a more fair venue." ■ A change of venue, however, is by its very nature an effective remedy only for *local* bias or prejudice. In cases of pretrial publicity, a court may assume that the resulting prejudice is stronger in the locality of the offense, which is likely also to be the locality of the publicity; in those cases, the defendant need not necessarily show lack of prejudice in other counties. Where pretrial publicity has been geographically widespread and pervasive, however, a court may deny change of venue on the sensible ground that it would do no good. (See, e.g., *People* v. *Manson* (1976) 61 Cal.App.3d 102, 174-177 [132 Cal.Rptr. 265]; cf. *People* v. *Edwards, supra,* 54 Cal.3d at p. 808 [prospective jurors in any county would feel sympathy for victims under facts of case].) ■ Similarly, the present record contains no showing— nor any reason to assume—that the incidence of bias against state prisoners is significantly stronger in Del Norte County than elsewhere in the state. One might assume that Del Norte County residents would tend to be more familiar with the operation and occupants of the prison, but greater familiarity with a generally unpopular group does not always result in greater bias; sometimes the effect is just the opposite.

Second, generalizations that an opinion survey expresses do not necessarily translate into operational beliefs. Most of the survey respondents chose "True," rather than "False," as a response to the statement, "Pelican Bay Prison inmates are not to be trusted." That does not mean that in the context

of a trial all such respondents would automatically refuse to believe the testimony of an inmate, when the court had instructed them on the need to assess the credibility of all witnesses with equal care and they had sworn to do so.[2]

The trial judge here is the only superior court judge in Del Norte County. He has presided over numerous trials of inmates for in-prison offenses. In denying the motion for change of venue, he relied in part on his experience that choosing unbiased juries for such trials had generally been comparatively easy; in most cases, counsel did not even exhaust their peremptory challenges. Voir dire had successfully identified, and the court had excused, the "handful of people" who "could not be fair in a trial involving an inmate" of Pelican Bay. The trial judge also noted that the last two trials of state prison inmates tried in his court had resulted in verdicts of not guilty. Thus, we cannot say, purely on the basis of this opinion survey, that those whom the trial court does not excuse nonetheless carry such deep biases as to make it inherently unlikely that an inmate can receive a fair trial in Del Norte County.

Nor does the record demonstrate a reasonable likelihood that appellant actually did not receive a fair trial in this case. As already noted, the court examined the prospective jurors on their attitudes toward prisoner testimony and in-prison offenses, and excused several who admitted partiality.[3] On appeal, appellant does not contend that the court should have excused any other jurors for cause.

## II. *Ineffective Assistance of Counsel*

■ Appellant claims that his trial attorney rendered ineffective assistance in several respects. To prevail on his claim, appellant must first show that counsel's performance was inadequate, i.e., that it fell below an objective standard of reasonableness under prevailing professional norms. (*People*

---

[2]The survey phrased its questions as generalizations, rather than absolutes. Believing that Pelican Bay inmates in general are violent is different from believing that all Pelican Bay inmates are violent. As the court noted, some of the generalizations in the survey—especially that Pelican Bay inmates are more dangerous than county jail inmates—may be accurate "on the average . . . ."

[3]Appellant complains that the court asked no "open-ended" questions. "But no case cited to us, or which we have found, has held that open-ended questions must always be asked to eliminate the possibility of bias." (*People* v. *Taylor* (1992) 5 Cal.App.4th 1299, 1315 [7 Cal.Rptr.2d 676], fn. omitted.) The court's standard set of questions included one that, while calling for a yes or no answer, was general in scope: "Do you have any feelings about the case that will make it difficult for you to be fair and impartial to both sides?" None of the questions appellant proposed, which he also criticizes the court for not asking, were open-ended; that is, all of them called for a yes or no answer.

v. *Ledesma* (1987) 43 Cal.3d 171, 216 [233 Cal.Rptr. 404, 729 P.2d 839].) In making this evaluation, we defer greatly to the attorney's tactical decisions, although not so much that we abdicate our duty to give the challenged acts or omissions meaningful scrutiny. (*Id.*, at pp. 216-217.) When a defendant raises this issue on appeal, and "the record sheds no light on why counsel acted or failed to act in the manner challenged," we must reject the contention " 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation' [citation] . . . ." (*People* v. *Haskett* (1990) 52 Cal.3d 210, 248 [276 Cal.Rptr. 80, 801 P.2d 323].) If appellant establishes deficient performance, he must also show prejudice, i.e., a reasonable probability that counsel's error affected the outcome of the proceeding. (*Ledesma, supra*, at pp. 217-218.)

## A. *Failure to Interview Cost*

■ Appellant first contends that counsel should have interviewed Cost and should have sought a continuance in order to locate him rather than proceeding to trial without having interviewed him. We conclude that the record demonstrates neither deficient performance nor prejudice.

The record shows that the court-appointed defense investigator billed one-half hour for his efforts to locate Cost on February 2, 1993. The investigator also interviewed and obtained statements from three other Pelican Bay prisoners. On March 4, 1993, at the change of venue hearing, counsel expressed his belief that Cost had been paroled to the Hayward area, and that there might be some delay in locating him. Counsel sought a continuance of the trial (then set for March 22), but the court deferred ruling on the request until another hearing on March 11. At that time, counsel sought, but the court denied, a stay of proceedings pending resolution of a writ petition in this court. On March 19, the court on its own motion vacated the March 22 trial date. On March 25, it set trial for April 12. At the March 25 trial setting hearing, counsel indicated that he had located Cost at San Quentin and would be seeking a transportation order.

At the trial confirmation hearing on April 8, appellant personally objected to going to trial without Cost. Counsel stated that Cost apparently had left San Quentin and returned to the Hayward area, but still had not been located or interviewed; according to counsel, Cost had been eluding him. Appellant volunteered his belief that Cost would testify that his attacker was not appellant. The court stated that it would consider granting a continuance if appellant submitted a written motion along with an affidavit.

The record thus shows that counsel took steps to locate Cost beyond the investigator's efforts on February 2. When the court vacated the March 22

trial date, counsel effectively used the resulting delay to locate Cost at San Quentin and sought to have him brought in for the trial. Cost, however, again eluded counsel. Eventually counsel made a tactical decision to go to trial without having interviewed Cost.

On this record, we cannot say that there could be no reasonable explanation for the extent of counsel's efforts to locate Cost or for the decision to proceed. Although appellant believed that Cost would testify in appellant's favor, the interviews with other prisoners may have suggested otherwise. Cost's elusiveness may have led counsel to believe that Cost would not be favorably inclined to testify for appellant. Counsel, moreover, already intended to call Llamas, who testified that appellant was not involved in the altercation. Counsel could have reasonably believed that Cost was unlikely to provide significant additional exculpatory evidence.

Nor does the appellate record show prejudice. We simply do not know how Cost would have testified. Even if he would have testified that appellant was not his attacker, appellant was not in fact charged for that attack, but for possession of a weapon. The prosecution's primary evidence was Armstrong's observation of appellant stuffing something into the bag in which Sergeant James found weapons. The jury convicted appellant of possessing a weapon, despite Llamas's testimony clearing appellant of participation in the fight; it is not reasonably likely that similar testimony from Cost would have altered the outcome.

### B. *Failure to Seek Dismissal for Delay in Filing Charges*

■ Appellant claims that counsel should have sought dismissal of the charges on the ground that the delay between the offense and the information's filing (Aug. 17, 1992, to Jan. 13, 1993) deprived him of due process by allowing Cost's parole, thereby preventing appellant from calling Cost as a witness. The record does not show, however, the date of Cost's parole; hence, it does not demonstrate any connection between the charging delay and Cost's pretrial parole. Moreover, as previously discussed, the record does not show that Cost's testimony would have been favorable to appellant or crucial to his defense. Nor does the record reflect why the charges were not filed until January 1993. Thus, there is no way to assess the likelihood that a motion for dismissal would have succeeded, and no cause for deeming counsel deficient in not filing one.

### C. *Failure to Object to Evidence at Trial*

■ Appellant's contention that counsel performed deficiently by failing to object to evidence of Cost's injury is without merit. First, counsel *did*

object—on grounds of relevance—when the prosecution initially offered such evidence. The court overruled the objection. Second, the court's ruling was correct, as Cost's incision, together with Armstrong's observation of appellant's attack on Cost, were circumstantial evidence of appellant's possession of a slashing-type weapon.

We need not decide whether counsel should have objected to questions about an "inmate code" that prevented inmates from testifying against each other. Appellant has not demonstrated any likelihood that Correctional Officer Reynoso's testimony about such a code influenced the jury's verdict.[4] In light of the strong circumstantial evidence that Officers Armstrong and James provided, we conclude that a different result was not likely had the court excluded evidence of an inmate code.

### III. *Sentencing Issue Raised on Habeas Corpus*

 The court sentenced appellant to the upper term of four years for violation of former section 4502 (now § 4502, subd. (a)) and ordered the term to run "consecutive to any and all other sentences [appellant] is now serving . . . ." The abstract of judgment records the sentence as a full consecutive term of four years. In his petition for writ of habeas corpus, appellant seeks relief on the ground that the court should instead have sentenced him to a consecutive subordinate term of one-third of the middle term, i.e., one year.

The criminal history transcript submitted with the probation officer's report shows that appellant is serving a sentence of 26 years to life for first degree murder. He received that sentence in 1984. In 1986, he was convicted in Sacramento Superior Court case No. 74155 of possessing a weapon (former § 4502) and sentenced to two additional years in state prison. According to a certified copy of the 1986 abstract of judgment, which the Attorney General submitted in his opposition to the habeas petition, the court ordered appellant to serve the 1986 sentence consecutive to the indeterminate murder sentence.

Former section 4502 (now § 4502, subd. (a)) mandates imposition of a consecutive sentence for violation of that section. Section 1170.1(c) provides that consecutive terms for in-prison felonies "shall commence from the time the person would otherwise have been released from prison." Section 1170.1(c), however, further provides that if the "new offenses" are consecutive to one another, the principal and subordinate terms "shall be calculated

---

[4]Only Reynoso testified that a code existed. The prosecutor also asked inmate Llamas about a code, and Llamas testified that it was, in fact, common for inmates to testify against each other.

as provided in [section 1170.1(a)], except that the total of subordinate terms may exceed five years. This subdivision shall be applicable in cases of convictions of more than one offense in different proceedings, and convictions of more than one offense in the same or different proceedings." Section 1170.1(a) generally provides for a principal-subordinate scheme of consecutive sentencing, in which the subordinate terms consist of only one-third of the statutory middle term.

In *People* v. *McCart* (1982) 32 Cal.3d 338 [185 Cal.Rptr. 284, 649 P.2d 926], the Supreme Court held that former section 1170.1, subdivision (b), which has since been renumbered as section 1170.1(c), requires "computation of a single term of imprisonment for all convictions of felonies committed in prison and sentenced consecutively, whether multiple convictions occur in the same court proceeding or in different proceedings." (*McCart, supra*, 32 Cal.3d at p. 343.) The court relied primarily on language of the section referring to a single " 'term' " for all in-prison offenses and making the subdivision applicable " 'in cases of convictions of more than one offense in different proceedings, and convictions of more than one offense in the same or different proceedings.' " (*McCart, supra*, at p. 343, italics omitted; see also *id.*, at pp. 343-345.)

The two in-prison convictions in *McCart* occurred in different proceedings, but less than two months apart. (*People* v. *McCart, supra*, 32 Cal.3d at p. 341.) *McCart* noted that the proceedings were "largely contemporaneous" (*id.*, at p. 342) and "express[ed] no opinion" about section 1170.1's application to "a prisoner who has received consecutive terms for a series of in-prison offenses and *several years later* commits a new series of in-prison offenses." (*McCart, supra*, 32 Cal.3d at p. 345, fn. 8, original italics.)

For two reasons, we conclude that section 1170.1(c) requires imposition of a single aggregate sentence in this case, even though appellant's in-prison offenses and convictions occurred several years apart. First, the plain language of section 1170.1(c) requires use of the principal-subordinate scheme even when the in-prison convictions occur in different proceedings; moreover, nothing in the statute restricts that rule to closely contemporaneous convictions. (See *People* v. *McCart, supra*, 32 Cal.3d at pp. 344-345 [language in statute calling for single aggregate term is not ambiguous].) For us to distinguish between contemporaneous and noncontemporaneous offenses or convictions would be to go beyond the scheme that the Legislature created.

Nor does an interpretation in accord with the plain language produce an absurd or obviously unintended result. ■ The intent of section 1170.1(c)

is manifestly to punish in-prison offenses "more severely than crimes committed 'on the outside.' " (*People* v. *McCart, supra,* 32 Cal.3d at p. 340.) But as *McCart* explains, the statute accomplishes this through two express exceptions to the principal-subordinate sentencing scheme: (1) the court must impose the first or most serious in-prison consecutive sentence as a new, full principal term; and, (2) the total of subordinate consecutive sentences for in-prison offenses may exceed five years. (*Id.,* at p. 344.) ██ Thus, we can serve the legislative purpose of harsher punishment without contravening or going beyond the language of the statute.

Second, there are inherent difficulties in basing application or nonapplication of section 1170.1(c) on the length of time passing between in-prison offenses or convictions. How much time must pass before offenses or convictions no longer qualify as "largely contemporaneous"? Do appellate courts set the limits of contemporaneity as general rules, or does the sentencing court in each case decide the question based on the circumstances of the individual case? If the latter, is it a discretionary sentencing choice for which the sentencing court must state reasons? While the convictions in the present case were clearly not contemporaneous, we are loath to embark on such a course of rulemaking without more specific legislative direction.

We therefore conclude that section 1170.1(c) required the sentencing judge to impose a single aggregate sentence for both of appellant's in-prison offenses, even though they occurred far apart in time.[5]

As to the proper remedy, appellant incorrectly asserts that we must reduce his four-year sentence for the current offense to one-third of the middle term, i.e., to one year. Instead, the sentencing court should have designated the sentence on the current offense as the principal term, since it was greater than the 1986 sentence (a mitigated two-year term), and reimposed the 1986 sentence as a subordinate term of one-third of the midterm. (§ 1170.1(a); Cal. Rules of Court, rule 452; *People* v. *McCart, supra,* 32 Cal.3d at p. 344, fn. 7.) Appellant's aggregate consecutive sentence should thus have been five years, fully consecutive to his sentence for murder.

---

[5]Neither *People* v. *Reed* (1993) 17 Cal.App.4th 302 [21 Cal.Rptr.2d 425], nor *In re Curl* (1983) 149 Cal.App.3d 236 [196 Cal.Rptr. 766], which the Attorney General cites, is to the contrary. Although *Curl* characterized *McCart* as applying to "contemporaneous, or nearly contemporaneous" offenses (*Curl, supra,* 149 Cal.App.3d at p. 239), *Curl's* holding was merely that a full consecutive sentence for a second in-prison offense was proper, because the defendant had received a *concurrent* sentence for his first in-prison offense. (*Id.,* at pp. 239-240.) In *Reed,* the defendant had been paroled from the sentence for his first in-prison offense, had violated parole, been returned to prison, and then committed a second in-prison offense while serving the parole violation term. (*Reed, supra,* 17 Cal.App.4th at p. 304.) The appellate court, while noting that "[t]he passage of time alone is troubling" (*id.,* at p. 306), actually *held* that a full consecutive term was proper for the second offense "[b]ecause Reed was released on parole between the first and second in-prison offenses . . . ." (*Id.,* at p. 307.)

## DISPOSITION

Appellant's conviction for possession of a weapon in state prison is affirmed. The petition for writ of habeas corpus is granted, and the superior court is ordered to resentence appellant as explained above, and to forward a corrected abstract of judgment to the Department of Corrections.

White, P. J., and Merrill, J., concurred.