[No. B195181. Second Dist., Div. Five. Sept. 19, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLTON V. MOSLEY, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.B.3. relating to court security fees.

**COUNSEL**

Christine C. Shaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TURNER, P. J.—**

## I. INTRODUCTION

Defendant, Carlton V. Mosley, appeals from his convictions for seven counts of making criminal threats (Pen. Code,[1] § 422) and one count of custodial possession of a weapon (§ 4502, subd. (a)). The trial court also found defendant was previously convicted of a serious felony and served four prior prison terms. (§§ 667, subds. (a), (b)–(i), 667.5, subd. (b), 1170.12.) Defendant argues there was insufficient evidence to support his convictions in counts 2, 5, 8, and 9, and the trial court improperly sentenced him to a full six-year consecutive term on count 4. The Attorney General argues court security fees should have been imposed. We reverse in part and affirm in part with modifications.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## II. FACTUAL BACKGROUND

We view the evidence in a light most favorable to the judgment. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Elliot* (2005) 37 Cal.4th 453, 466 [35 Cal.Rptr.3d 759, 122 P.3d 968]; *People v. Osband* (1996) 13 Cal.4th 622, 690 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *Taylor v. Stainer* (9th Cir. 1994) 31 F.3d 907, 908–909.) Defendant was an inmate at the Los Angeles County Twin Towers Correctional Facility for approximately eight months. Defendant was housed in the module 121 disciplinary unit. Each cell in that unit is for one individual and has no windows. The cell has a tray slot and a solid door with a porthole window. The inmates in that module are not allowed visits or telephone calls. Trustees clean trash inside the cells only in the absence of the inmate housed there and under the supervision of a deputy. Inmates' cells are usually searched when they are either taking a shower or out to court. Any contraband or weapons are removed from the cell following the search. Contraband had previously been found in defendant's cell.

Deputy Wargo[2] worked in the Twin Towers jail during defendant's incarceration in module 121. Deputy Wargo dealt with defendant on a daily basis. Defendant threatened Deputy Wargo at least a couple of times each week. On August 23, 2005, Deputy Wargo was standing inside the module officer's booth when defendant pressed the emergency intercom button. Deputy Wargo responded to defendant. Defendant was asked what he needed. Defendant asked who was speaking. Deputy Wargo identified himself. Defendant asked if Deputy Wargo was alone. Deputy Wargo said he was alone. Defendant then said he was going to court later in the week. Defendant said he would use the phone in the court lockup to call his "homies" to obtain information from the Department of Motor Vehicles. The information would reveal Deputy Wargo's address and automobile registration. Deputy Wargo knew that defendant was a member of a local criminal street gang. Deputy Wargo understood the term "homies" to be fellow gang members. Defendant also said he would have his "homies" wait outside the jail. The gang members would follow Deputy Wargo home and then kill him. Defendant said the gang members would also kill Deputy Wargo's family. Deputy Wargo testified, "He stated that he hated me." Deputy Wargo also testified: "He stated that he was going to have the homies, once again, go to my house, shoot me with a 12-gauge shotgun, blow my head off, make sure I had a closed casket funeral. [¶] He stated he was going to have the homies run a train—have sex, with my wife. He was going to molest my kids. He was, in fact, going to also rape my wife."

---

[2] None of the deputies who testified were identified by their first names in any documents or testimony. We will refer to the deputies as they were identified in court.

Deputy Wargo described other threat-related statements: "He stated for me to check his records, call Chino. Call his parole officer." Defendant made reference to his gang moniker and affiliation. Deputy Wargo was aware that a correctional officer had been killed at Chino state prison earlier that year by another local criminal gang member. Defendant mentioned the killing of the correctional officer to Deputy Wargo on several occasions. Defendant also said he had been in a fight in the court lockup area the week before. Deputy Wargo testified, "He stated that while he was fighting this inmate, he pictured the inmate to be me and, in essence, wanted to kill me." Deputy Wargo was afraid for his life and those of his family members. Defendant had previously threatened Deputy Wargo. But the prior threats were not as detailed as those made on August 23, 2005. As a result of those threats, Deputy Wargo notified his superiors at the jail and family members. Deputy Wargo altered his routines by doing such things as being cognizant of his surroundings at all times; taking different routes home; and circling his house prior to parking and going inside.

On September 13, 2005, defendant refused to get ready to go to court. Defendant demanded to speak to a sergeant. Defendant was "extremely irate and just very adamant" about the fact that he did not want to go to court. Deputy Coss and the sergeant spoke with defendant. It was then determined that defendant would not be transported to court. Deputy Coss left defendant's cell. Defendant then said, "You need to worry about 245 on deputy sheriff . . . with this motherfucken knife I have." Deputy Coss was aware that a "245" is the Penal Code section for assault with a deadly weapon. Deputy Coss returned to his booth. Deputy Coss turned on the intercom inside defendant's cell. Deputy Coss overheard defendant speaking to an adjacent inmate. Defendant said that he was going to slash the first deputy that entered his cell. Defendant sounded serious. Defendant was boasting that he would slash a deputy. Deputy Coss returned to defendant's cell. Defendant was standing in the back of his cell when Deputy Coss looked through the window. Defendant had removed his identification wristband. Defendant was asked what he had done with the metal clasp to the wristband. Defendant said he flushed it down the toilet. Defendant then reached underneath his metal bunk and pulled out a small razor blade with a handle attached. Defendant said, "You need to worry about this, you know, not no little metal clasp." Defendant made a slashing motion back and forth. Defendant said, "This motherfucker is for Deputy Wargo." Deputy Coss ordered defendant to hand over the razor blade several times. Defendant ultimately slid the razor under the door. Defendant said: "I got that one at court. I will get another one at court." Deputy Coss notified Deputy Wargo about defendant's threats. Defendant was not allowed to have a disposable razor in the disciplinary module. The razor in defendant's possession was a "shank" or jail-made knife or stabbing device.

Deputy Patino also worked at the Twin Towers jail. Deputy Patino was familiar with defendant. At approximately 4:50 p.m. on September 13, 2005, Deputy Patino conducted a routine search of defendant's person. This occurred when defendant returned to the jail from a court appearance. Deputy Patino removed excessive food and hygiene materials from defendant because they constituted contraband. Defendant became angry and responded to Deputy Patino's seizure of the food and hygiene materials, "He started telling me that he knew it was a plot and told me that it was his stuff and that he was going to get me back." Defendant was returned to his cell. Deputy Patino heard a loud bang coming from the direction of the cell. Deputy Patino walked to the cell to conduct a security check. Defendant called out, "Hey, Patino, is that you?" Deputy Patino replied. Defendant then asked Deputy Patino to come over to the cell. Deputy Patino remained outside the cell. Deputy Patino described what happened upon arriving at defendant's cell: "He started threatening my life. [¶] . . . He started telling me that he was going to kill me, that he knew people, he could get my name, my address, what kind of vehicle I drove. [¶] . . . He made reference to another inmate that we had had in our custody and had told me he was going to do the same thing that that inmate supposedly did to a prison guard upstate." Defendant claimed he could get this personal information from Department of Motor Vehicles employees. The killing of a prison guard was in reference to the stabbing of a correctional officer in Chino. The inmate involved in the killing of the prison guard was a member of the same gang as defendant. Deputy Patino described the words used by defendant, "He said he was going to slice me up like the pig that I am, and he was making [slicing] motions with his arm."

Defendant claimed to know Deputy Patino's work schedule. Deputy Patino described defendant's threats in this regard thusly: "[H]e had people that would wait for me at my house. [¶] . . . When I got out of work that he would have somebody waiting for me outside my house on my return." Defendant threatened to have the attack occur on September 27. Deputy Patino testified, "He told me that to make sure I kiss them goodbye on that day because it's the last time I would be seeing them." During this interaction, defendant would refer to his gang affiliation and display his tattoos.

Deputy Patino was afraid for his life and the safety of his family following these threats. Deputy Patino was particularly concerned about defendant's reference to the Department of Motor Vehicles. Deputy Patino was also worried about the threat to have somebody waiting outside for him. Deputy Patino began taking different routes while driving home. Deputy Patino was aware of the similar threats that defendant had made to Deputy Wargo.

Deputy Patino heard defendant threaten Deputy Wargo. Defendant seemed serious while making those threats. Deputy Patino was concerned for Deputy Wargo's safety. Deputy Patino had heard of reports of Department of Motor Vehicles employees selling identity information. When questioned by the prosecutor, Deputy Patino testified: "Q. Did you think he might be able to get your information from [the] D.M.V.? [¶] A. Yes."

The inmates in the disciplinary unit were required to lie facedown on their bunks away from the door when their food was delivered. On September 14, 2005, Deputy Wargo delivered defendant's food. Deputy Wargo placed defendant's food tray inside the cell. Defendant then made a motion as though he was getting up from the bunk. As Deputy Wargo closed the door, defendant "rushed the door." September 14, 2005, was the day after Deputy Coss secured the shank from defendant. On that same day, Deputy Wargo and Deputy Patino approached defendant's cell. Deputy Wargo testified defendant said: "Yeah, I gave the razor to Coss today. [¶] . . . He stated that the razor was for me . . . and Patino." Deputy Wargo described defendant's next statement: "He stated he was going to kill me, and he didn't care. My partners could come in, all they would do is just . . . beat his ass, but he would be pissing on my grave." Deputy Wargo feared for his life at that time and continued to do so at trial. This is because defendant was a member of a powerful street gang. Defendant threatened Deputy Wargo on a daily basis.

On October 21, 2005, defendant was being escorted back to his cell after a court appearance. Defendant was accompanied by Deputies Wargo and Patino. As they walked through a sliding security door, defendant lunged and banged his back against the wall. Defendant then sat down. Defendant began yelling, "Oh, you have done it now, you have done it now." Defendant was handcuffed with a waist chain, but the deputies were not holding on to him. Other inmates could see and hear what was happening. Defendant yelled something like, "I told you not to put your hands on me." Defendant said he could not move. Defendant wanted a sergeant to be present and to be taken to the clinic. The deputies called for a supervisor several times. However, no one arrived for at least five minutes because of a shift change. In the interim, defendant was instructed to get up. Defendant did not comply. Defendant started laughing saying, "$1 million, $1 million." Deputy Wargo described what the reference to $1 million meant: "That he was going to sue us for $1 million." Defendant then kicked the middle of Deputy Wargo's leg. Eventually, defendant fought until a number of other deputies arrived and pepper spray was used to subdue him.

Deputy Ben-Sahile worked in the Twin Towers jail in the high-powered module 132. Inmates housed there are separated from all other inmates and require special precautions when deputies have dealings with them. The

inmates in that module are considered to be more dangerous. Deputy Ben-Sahile was instructed to have a sergeant present with a Taser before opening defendant's cell door for any reason. Deputies must exercise more caution with all inmates in module 132. At approximately 7:00 p.m. on October 27, 2005, defendant began banging on the glass in his cell door. Deputies Ben-Sahile and Banuelos went to defendant's cell door. Defendant continued to bang on the glass and yell. Deputy Ben-Sahile told defendant to stop banging and yelling obscenities. Deputy Ben-Sahile testified regarding defendant's response, "[H]e stated to me that the first chance that he gets he's going to attack me." Also, Deputy Ben-Sahile testified defendant said: "He said he was going to get his peep's after me. [¶] . . . [H]e said that the first chance he's going to get he's going to shank me and other deputies." Further, defendant threatened to kill Deputies Ben-Sahile, Wargo, Patino, Coss, Banuelos, and Carmona. Defendant said, "I am going to have them killed, I am going to kill them." Defendant also said that he knew how to manipulate the doors and he planned to "shank" staff. Deputy Ben-Sahile was afraid for his personal safety at the time and continued to be so at the time of trial. One of the factors creating this fear was defendant's gang affiliation. The other 15 inmates in the module reacted by banging on the glass too. Defendant was later removed from that cell because the door was fatigued. The locking mechanism would no longer lock. Deputy Ben-Sahile notified Deputies Patino, Wargo, Coss, and Carmona about defendant's threats.

Defendant told Deputy Ben-Sahile about an inmate at the state prison at Chino. Defendant claimed to have "trained" the inmate. This statement was made after that inmate had killed a correctional officer in Chino. That caused Deputy Ben-Sahile to be more afraid. Deputy Ben-Sahile learned that defendant was found with a shank after leaving module 132.

Deputy Ben-Sahile was aware that inmates often obtained contraband from other inmates when they traveled to and from court appearances. In addition, inmates verbally communicate with other inmates in the module when they are out of their cells for a shower or other purposes. The inmates also pass things under the gap in the cell doors. An inmate could pass a message to someone outside the jail by having another inmate make a telephone call for him. Messages can also be relayed at the time of visiting. Deputy Ben-Sahile described his fears thusly: "[H]e could tell somebody, his peep's or people out on the streets to come and find me and attack me or my partners or he could have another inmate do it."

Deputy Carmona was informed by Deputy Ben-Sahile of defendant's threats. Deputy Carmona was fearful of defendant. In the past, defendant had made references that he belonged to a local gang. Defendant stated that another member of the local gang had killed a prison guard. Thereafter,

between October 27, 2005, and November 3, 2005, defendant repeated his ability to get access to Department of Motor Vehicles information. Defendant threatened to kill Deputy Carmona. Deputy Carmona feared for his safety. At the time of trial, Deputy Carmona remained afraid of defendant. Deputy Carmona was aware that inmates often brought contraband back from court, which they acquired from other inmates. Deputy Carmona was familiar with the practice of "fishing" wherein inmates pass items from one cell to another. Deputy Carmona was also aware that inmates often requested other inmates make phone calls for them.

Defendant testified on his own behalf. On cross-examination, the prosecutor introduced a tape recording of defendant's statements made to different deputies on various dates, which was played for the jury at trial. A transcript of the tape was also distributed to the jurors. In the tape defendant said: "You got a vest on? Huh? . . . You ain't got no vest on that head. [¶] . . . [¶] Stay out of the street, homie. Do that on the street. My homies do home invasions, carjackings. My homies. For a little bit of nothing. . . . Think about it. Just think about it. Shot caller. Big baller. Big baller. Shot caller. You know what I mean? . . . It's kind of amazing for me to be so loved, to be so recognized, and have so much power in jail and on the street. . . . Everybody on the bus listen to me. And they write names and numbers down, homie. That's all they do. Make phone calls. . . . Oh no, I'll fuck y'all up. Watch, when I come in here with that band-aid on. I been abused. You fucked me up on the way to the shower, remember? . . . [¶] Snap your motherfucking neck. And I'll go to sleep feeling good. I'll show you. I'm gonna find out where you (unintelligible). I'm gonna find out. I'm gonna find out your real name too. I ain't gonna sleep until I do. [¶] I love going to court. I got people on the bus. They make phone calls for me, nigger. You know what I mean? . . . Y'all gonna keep me away from the phones and visits. I got my ways. You know what I mean? I got my ways to get my shit out. [¶] . . . [¶] Let me go to your house while you're at work, when your wife and kids at home. And then when you come home, let me make a (unintelligible). That's the game I want to play, for fucking with me. I'm going to show you the game I play when I get on the street. [¶] . . . [¶] . . . I put a police in a coma in 1996. . . . [¶] . . . [¶] But what you gonna do? . . . You don't have no vest on that head. Huh? . . . I trained Psycho to kill, nigger. That's why my name popped up at Chino. . . . [¶] . . . [¶] [H]is wife and . . . y'all kids while you doing this sixteen hours a day. It's only 24 hours a day. I know y'all live an hour and a half, two hours away from here. Y'all don't get nowhere. [¶] . . . We killing motherfucking co's. And some of you deputies smell just like cos. [¶] . . . [¶] What, you got a vest on? Huh? . . . at work. In the jail house with a vest. I bet you don't wear that uniform on the street, like you do in here. You take that shit off. Don't you? You change, huh? Probably put a hat on, glasses, huh? Be paranoid as a motherfucker. Be paranoid! What if I see you in a dark alley,

just me and you? . . . [¶] Cause I'll eat your ass up. I'll eat you up . . . like Tyson did Holyfield. I'll bite your ear off." Defendant admitted: the reference to the absence of a vest on a deputy's head was made to Deputy Ben-Sahile; the references to carjackings, home invasion robberies, and snapping a deputy's neck were made to Deputy Wargo; and the threat to go to a deputy's home while he was at work was made to Deputy Coss. Defendant said to Deputy Coss, "While you at work doing 16 hours, I be at home making love to your kids—to your wife and playing with your kids, my stepkids." At another point while being cross-examined about statements to Deputy Wargo, the following occurred: "Q. Why did you tell him, 'You don't have a vest on you head'? [¶] A. Because, like I say, ma'am, I did tell him 'jab, jab, jab, I am going to hit it.' [¶] Q. So you're talking to him about not having a bullet-proof vest on his head because you're going to hit him with your fist? [¶] A. Yeah." Defendant further acknowledged telling Deputy Wargo, "Be paranoid as a motherfucker, be paranoid." In one portion of the tape, defendant made a motion across his throat toward Deputy Lamb.

## III. DISCUSSION

### A. Sufficiency of the Evidence

Defendant contends there was insufficient evidence to support his convictions in counts 2, 5, 8, and 9. The victims in these counts were Deputies Patino, Ben-Sahile, Coss, and Carmona respectively. We view the evidence in a light most favorable to the judgment. (*Jackson v. Virginia, supra,* 443 U.S. at p. 319; *People v. Elliot, supra,* 37 Cal.4th at p. 466; *Taylor v. Stainer, supra,* 31 F.3d at pp. 908–909.) Our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia, supra,* 443 U.S. at p. 319; *People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Marshall* (1997) 15 Cal.4th 1, 34 [61 Cal.Rptr.2d 84, 931 P.2d 262]; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) The California Supreme Court has held: "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin, supra,* 18 Cal.4th at p. 331, quoting *People v. Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

Section 422 provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if

there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

In *People v. Toledo* (2001) 26 Cal.4th 221, 227–228 [109 Cal.Rptr.2d 315, 26 P.3d 1051], the California Supreme Court held: "In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (See also *People v. Bolin, supra,* 18 Cal.4th at pp. 337–340, fn. 13; *In re Ryan D.* (2002) 100 Cal.App.4th 854, 859–860 [123 Cal.Rptr.2d 193]; *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1136 [105 Cal.Rptr.2d 165]; *People v. Lopez* (1999) 74 Cal.App.4th 675, 679 [88 Cal.Rptr.2d 252] ["[t]he statute does not require an immediate ability to carry out the threat"].) Section 422 targets those who try to instill fear in others. (*In re Ryan D., supra,* 100 Cal.App.4th at p. 861; *People v. Felix* (2001) 92 Cal.App.4th 905, 911, 913 [112 Cal.Rptr.2d 311].)

Defendant argues that there was insufficient evidence as to the "immediate prospect of execution" and "sustained fear" as to the counts in question because at the time he made the threats he was "an inmate housed in a segregated module." Defendant argues that the criminal threats involved deputies assigned to the high security module who were in contact with him daily and knew him to be disruptive. In addition, defendant argues that the threats related to counts 5, 8, and 9 were all made on the same day to Deputy Ben-Sahile who communicated them to Deputies Coss and Carmona.

Defendant reasons: "Although [Deputies] Ben-Sahile, Coss and Carmona may have disliked [defendant] and were angered by his words, there is insufficient evidence the alleged 'threat' was so unequivocal, immediate, and specific as to convey to the deputies an immediate prospect of execution of the threat causing them to be in sustained fear for their safety or their family's safety." We disagree.

■ As we explained in *People v. Gaut* (2002) 95 Cal.App.4th 1425, 1431–1432 [115 Cal.Rptr.2d 924], " '[T]he determination whether a defendant intended his words to be taken as a threat, and whether the words were sufficiently unequivocal, unconditional, immediate and specific they conveyed to the victim an immediacy of purpose and immediate prospect of execution of the threat can be based on all the surrounding circumstances and not just on the words alone. The parties' history can also be considered as one of the relevant circumstances. [Citations.]' [Citation.]" (*People v. Gaut, supra*, at p. 1431, quoting *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340–1341 [69 Cal.Rptr.2d 728]; see also *In re Ryan D., supra*, 100 Cal.App.4th at p. 860 [the circumstances under which the threat is made gives meaning to the actual words used]; *People v. Solis* (2001) 90 Cal.App.4th 1002, 1011–1016 [109 Cal.Rptr.2d 464]; *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1538 [70 Cal.Rptr.2d 878] ["the word 'immediate' . . . mean[s] that degree of seriousness and imminence which is understood by the victim to be attached to the *future prospect* of the threat being carried out" (original italics)]; *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1220–1221 [62 Cal.Rptr.2d 303] [the actions of the accused after making the threat may serve to give meaning to it]; *People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1158 [38 Cal.Rptr.2d 328]; *People v. Gudger* (1994) 29 Cal.App.4th 310, 321 [34 Cal.Rptr.2d 510].)

■ In this case, for purposes of appeal, defendant does not deny that he made the threats. Rather, he attempts to minimize their significance by pointing out that he was known as a difficult inmate and the deputies were in control of his confinement and limited movement. However, in each instance, the deputies were placed in fear because of defendant's ability to obtain weapons as well as his "connections" in the gang within the community. On September 13, 2005, Deputy Coss found defendant in possession of a prison-made shank in the form of a modified razor. Later that same day, Deputy Patino conducted a routine search of defendant. This occurred following defendant's return from a court appearance. Deputy Patino removed contraband from defendant's possession. Defendant became irate. Deputy Patino walked over to defendant's cell. Deputy Patino described what happened next, "He started telling me that he was going to kill me, that he

knew people, that he could get my name, my address, what kind of vehicle I drove." Defendant made reference to the fellow gang member who had killed a correctional officer in Chino. Defendant threatened to cut up Deputy Patino like a "pig." Defendant made slashing motions across his body as he spoke. Defendant claimed to know Deputy Patino's schedule. Defendant also threatened to have people wait at Deputy Patino's residence. Defendant removed his shirt and pointed to his gang-related tattoos, repeating the name of the gang several times. Defendant later attacked Deputy Patino on October 21, 2005. This followed defendant's court appearance. There was substantial evidence that defendant's threats toward Deputy Patino were unequivocal, unconditional, immediate, and specific with an immediate prospect of execution. Deputy Patino remained fearful when he testified at trial in this case. After the foregoing threats were made, Deputy Patino regularly checked his rearview mirror several times when leaving the parking lot after work, checked nearby automobiles, and exited before or after his regular freeway exit to be certain no one was following him.

The same is true for the threats made on October 27, 2005, against Deputies Ben-Sahile, Coss, and Carmona. Defendant threatened to kill Deputies Ben-Sahile, Wargo, Patino, Coss, Banuelos, and Carmona. Defendant told Deputy Ben-Sahile, "I am going to have them killed, I am going to kill them." Defendant also said that he knew how to manipulate the doors and he planned to "shank" staff. The door to defendant's cell was soon thereafter found to be "fatigued" where the locking mechanism was located, preventing it from being locked. Deputy Ben-Sahile notified Deputies Patino, Wargo, Coss, and Carmona about defendant's threats to kill them. Defendant also told Deputy Ben-Sahile about another inmate at the state prison at Chino who killed a correctional officer. Defendant claimed to have "trained" the killer. Deputy Ben-Sahile was aware that the inmate defendant mentioned had killed a correctional officer. The correctional officer had been stabbed to death.

Deputy Ben-Sahile also spoke to Deputy Carmona. Deputy Ben-Sahile relayed defendant's threats to kill Deputy Carmona. Deputy Carmona had knowledge of defendant's gang affiliation and references to another inmate's murder of a prison guard. This made Deputy Carmona very fearful. Between October 27, 2005, and November 3, 2005, defendant spoke to Deputy Carmona. Defendant said he had "people" at the Department of Motor Vehicles. These employees could look up Deputy Carmona's personal information. This information would permit defendant to kill Deputy Carmona after being released. Deputy Carmona was still afraid of defendant at the time of trial.

Deputy Coss was familiar with defendant's possession of a jail-made shank. On September 13, 2005, Deputy Coss activated the intercom in defendant's cell. Deputy Coss overheard defendant speaking to an inmate in an adjacent cell. Deputy Coss testified, "He was bo[a]sting that he was going to slash the first deputy that entered his cell." Deputy Coss then saw defendant with a jail-made shank. Defendant was standing in his cell with the shank. Defendant said, "You need to worry about this, you know, not no little metal clasp." Defendant made a slashing motion back and forth. Defendant ultimately slid the razor under the door. Defendant said: "I got that one at court. I will get another one at court." Based on all of the facts, the jury could reasonably find defendant's threats against Deputy Coss were unequivocal, immediate, and specific. Further, given the nature of these threats, they conveyed to Deputy Coss an immediate prospect of execution causing him to be in sustained fear for his safety.

## B. Sentencing

### 1. Background

As a juvenile, defendant was placed on home probation. On May 29, 1986, as an adult, defendant was arrested for narcotics possession for purposes of sale in violation of Health and Safety Code section 11351. After violating the conditions of his probation, he was sentenced to prison on April 15, 1987. On January 17, 1987, defendant was arrested for cocaine possession in violation of Health and Safety Code section 11350 and sentenced to prison. After being paroled, defendant was arrested for possession of narcotics for sale and sentenced to prison.

After being paroled, defendant was arrested for narcotics possession and sentenced to prison on September 24, 1991. After being paroled, on June 14, 1993, defendant was arrested for driving without a license in violation of Vehicle Code section 12500, subdivision (a) and placed on probation. In 1994, defendant was arrested for assaulting Paula W. Paula stated she had been assaulted by defendant for years. On April 6, 1995, defendant was arrested again for driving without a license in violation of Vehicle Code section 12500, subdivision (a) and placed on probation.

On January 13, 1997, defendant was arrested and ultimately convicted of criminal threats and trespassing in violation of section 602.5. On January 26, 1997, defendant was arrested for making criminal threats and driving an automobile without the owner's consent in violation of Vehicle Code section 10851, subdivision (a) and eventually placed on probation. On February 19, 1997, defendant was arrested for resisting arrest in violation of section 148, subdivision (a) and domestic violence (§§ 242, 243, subd. (e)). The victim

was once again Paula and defendant was placed on misdemeanor probation. Defendant was eventually found in violation of probation. On May 22, 1997, defendant was arrested for corporal injury on a spouse and burglary in violation of sections 273.5, subdivision (a) and 459 and sentenced to prison for nine years. On May 20, 2005, defendant was arrested for aggravated assault. Defendant committed his present offenses while on parole and awaiting trial on the aggravated assault charge. The foregoing penitentiary sentences served as the basis of the trial court's prior prison term findings.

### 2. The trial court improperly sentenced defendant as to count 4 to a full term

The trial court selected count 1, the criminal threat directed at Deputy Wargo, as the principal term. The trial court imposed the midterm of two years and doubled it pursuant to section 667, subdivision (e)(1). Counts 2 and 3 involved the criminal threats directed at Deputies Patino and Wargo respectively. The trial court then imposed consecutive one-third the midterm doubled as to counts 2 and 3, to be served consecutively to count 1. The trial court then imposed one-third the midterm doubled as to count 5, which involved the criminal threat directed at Deputy Ben-Sahile, to be served consecutively to counts 1, 2, and 3. The trial court doubled the midterm as to counts 7, 8 and 9. The trial court ordered counts 7, 8, and 9 to be served concurrently with each other and count 5. The trial court then ordered: "[A]s to count 4, that is violation of Penal Code section 4502, a possession of a weapon in custody, that is by law required to be fully consecutive for the reasons I've already mentioned." Thereafter, the trial court selected the midterm of three years and doubled it as to count 4.

Defendant argues that the trial court improperly sentenced him to a full six-year consecutive term on count 4, custodial possession of a weapon. (§ 4502, subd. (a).) Defendant acknowledges section 4502, subdivision (a)[3] requires the imposition of consecutive sentences. Nonetheless, defendant argues the trial court should have imposed one-third the midterm pursuant to section 1170.1, subdivision (a) as to count 4. Defendant reasons the count 4 sentence was subordinate to the principal term imposed as to count 1, and he was convicted of "multiple in-prison offenses . . . ." The Attorney General agrees that two full terms may not be the subject of consecutive sentences.

 The trial court imposed full-term consecutive sentencing as to counts 1 and 4. Count 1 involves the criminal threat made to Deputy Wargo on

---

[3] Section 4502 provides in pertinent part: "(a) Every person who, while at or confined in any penal institution . . . possesses or carries upon his or her person or has under his or her custody or control any instrument or weapon of the kind commonly known as . . . any dirk or dagger or sharp instrument . . . is guilty of a felony and shall be punished by imprisonment in the state prison for two, three, or four years, to be served consecutively."

August 23, 2005. Defendant received a four-year term for this criminal conviction. Count 4 involves the custodial weapon possession charge which occurred on September 14, 2005. For the weapon possession count, defendant received a six-year term. As noted, section 4502 requires that defendant be sentenced consecutively on the weapon possession count. However, unlike section 667.6, subdivision (c) or (d), there is no provision for full-term consecutive sentencing on multiple counts in section 4502, subdivision (a). Our Supreme Court has explained the special rules applicable to specified violent sex offenses which, depending on the circumstances, require or allow for consecutive full-term sentencing: "Under section 1170.1, subject to certain exceptions, the greatest term of imprisonment imposed for any of the crimes is designated the principal term. To the principal term is added subordinate terms, . . . consisting of one-third of the middle term prescribed for each additional felony conviction. (§ 1170.1, subd. (a).) . . . [¶] Under the exception to section 1170.1 provided by section 667.6(c), imposition of consecutive *full-term* sentences is permitted if a defendant is convicted of certain sexual offenses. Section 667.6[, subdivision] (c) provides, in pertinent part: 'In lieu of the term provided in Section 1170.1, a full, separate, and consecutive term may be imposed for each violation of . . . subdivision (2) or (3) of Section 261 [rape], . . . Section 289 [genital penetration by a foreign object], or of committing sodomy or oral copulation in violation of Section 286 or 288a by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person whether or not the crimes were committed during a single transaction.' " (*People v. Hicks* (1993) 6 Cal.4th 784, 789–790 [25 Cal.Rptr.2d 469, 863 P.2d 714], original italics; see *People v. Jones* (1988) 46 Cal.3d 585, 592 [250 Cal.Rptr. 635, 758 P.2d 1165].) As can be noted, section 667.6, subdivision (c) provides for "a full, separate, and consecutive term" under enumerated circumstances. Section 4502, subdivision (a) requires consecutive sentencing but there is no provision which permits the imposition of full terms as occurred here. Thus, we must reverse either the count 1 or 4 full-term sentence. Full terms may not be imposed on *both* counts 1 and 4; one of the two sentences must become a subordinate term.

Section 1170.1, subdivision (a)[4] requires that the greatest sentence be the principal term which in this case is the six-year term imposed under count 4—the weapon possession conviction. Count 1 must therefore become a 16-month subordinate term. This reduces defendant's sentence from 19 years to 16 years four months. The problem is that the trial court imposed concurrent terms as to the criminal threat convictions in counts 5, 7, 8, and 9. Further, because the sentence was "substantial" in the trial court's view, no one-year section 667.5 enhancements were imposed; rather they were

---

[4] Section 1170.1, subdivision (a) states in part, "The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes . . . ."

stricken. Whether the trial court wants to increase the sentence from 16 years four months back to a figure closer to 19 years is a matter within its discretion. But the interests of justice warrant the trial court making that decision. (§§ 1260, 1259.)

Therefore, the four-year term imposed as to the count 1 sentence is reversed. The sentence as to count 1 will be 16 months, which is one-third of the midterm doubled pursuant to sections 667, subdivision (e)(1) and 1170.12, subdivision (c)(1). The concurrent sentencing orders and those striking the prior prison term enhancements are reversed. Upon issuance of the remittitur, the trial court may exercise its discretion as it sees fit as to the counts 5, 7, 8, and 9, and the prior prison term enhancements. Under no circumstances may the aggregate term exceed 19 years. (*People v. Hanson* (2000) 23 Cal.4th 355, 357 [97 Cal.Rptr.2d 58, 1 P.3d 650]; *People v. Henderson* (1963) 60 Cal.2d 482, 495–497 [35 Cal.Rptr. 77, 386 P.2d 677].)

The parties have adverted to section 1170.1, subdivision (c)[5] and cases interpreting that provision of law including *People v. McCart* (1982) 32 Cal.3d 338, 343–345 [185 Cal.Rptr. 284, 649 P.2d 926] and *People v. Venegas* (1994) 25 Cal.App.4th 1731, 1742–1743 [31 Cal.Rptr.2d 114]. Section 1170.1, subdivision (c) has nothing to do with this case. When defendant possessed the shank and made the criminal threats he was not "confined in a state prison or . . . subject to reimprisonment for escape from custody" within the meaning of section 1170.1, subdivision (c).

### 3. Court security fees*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[5] Section 1170.1, subdivision (c) states: "In the case of any person convicted of one or more felonies committed while the person is confined in a state prison or is subject to reimprisonment for escape from custody and the law either requires the terms to be served consecutively or the court imposes consecutive terms, the term of imprisonment for all the convictions that the person is required to serve consecutively shall commence from the time the person would otherwise have been released from prison. If the new offenses are consecutive with each other, the principal and subordinate terms shall be calculated as provided in subdivision (a). This subdivision shall be applicable in cases of convictions of more than one offense in the same or different proceedings."

*See footnote, *ante*, page 313.

## IV. DISPOSITION

The sentences as to counts 1 and 4 are reversed and modified as set forth above. The judgment is also modified to impose the security fees as noted. The judgment is affirmed in all other respects. The trial court is to personally ensure a corrected abstract of judgment is prepared and forwarded to the Department of Corrections and Rehabilitation.

Mosk, J., and Kriegler, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 19, 2007, S157508.