Carlton **MOSLEY**, Sr., aka Carlton V. Mosley, Sr., Petitioner

v.

J. **WALKER** (Warden) A, Respondent.

Case No. CV 08–4364–ABC (RC).

United States District Court, C.D. California.

May 27, 2009.

---

Carlton Mosley, Sr., Represa, CA, pro se.

Mary E. Sanchez, Office of Attorney General of California, Los Angeles, CA, for Respondent.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

AUDREY B. COLLINS, Chief Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, as well as petitioner's objections, and has made a *de novo* determination.

IT IS ORDERED that (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered denying the petition for writ of habeas corpus and dismissing the action with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on petitioner.

## REPORT AND RECOMMENDATION OF A UNITED STATES MAGISTRATE JUDGE

ROSALYN M. CHAPMAN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Audrey B. Collins, Chief United States District Judge, by Magistrate Judge Rosalyn M. Chapman, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

## BACKGROUND

### I

On June 8, 2006, in Los Angeles County Superior Court case no. BA289992, a jury convicted petitioner Carlton Mosley, Sr., aka Carlton V. Mosley, Sr., of seven counts of making a criminal threat in violation of California Penal Code ("P.C.") § 422 (counts 1–3, 5, 7–9) and one count of custodial possession of a weapon (shank) in violation of P.C. § 4502(a) (count 4). Clerk's Transcript ("CT") 301–13. On November 3, 2006, the trial court sentenced petitioner to the total term of 19 years in state prison. CT 388–96.

The petitioner appealed the judgment to the California Court of Appeal, CT 397, which, in a partially published opinion filed September 19, 2007, "reversed and modified" the "sentences as to counts 1 and 4" and "in all other respects" affirmed the judgment. *See People v. Mosley,* 155 Cal. App.4th 313, 330, 65 Cal.Rptr.3d 856 (2007); Lodgment nos. 1–4. On October 2, 2007, petitioner, proceeding through counsel, filed a petition for review in the California Supreme Court, which denied the petition on December 19, 2007. Lodgment nos. 5–6.

On February 4, 2008, the Superior Court resentenced petitioner to the term of 16 years and 4 months in state prison, including the mid-term of 6 years on count 4. Sentencing Reporter's Transcript; Supplemental Lodgment no. 2. The petitioner did not appeal the new sentence. Declaration of Mary Sanchez ¶¶ 3–4.

### II

■ The California Court of Appeal, in affirming petitioner's convictions, made the following findings of fact: [1]

---

1. This Court "presume[s] that the state court's findings of fact are correct unless Petitioner rebuts that presumption with clear and convincing evidence. Petitioner has not attempted to overcome the presumption with respect to the underlying events. [The Court] therefore rel[ies] on the state court's recitation of the facts." *Tilcock v. Budge,* 538 F.3d 1138, 1141 (9th Cir.2008) (citations omitted), *cert.*

[Petitioner] was an inmate at the Los Angeles County Twin Towers Correctional Facility for approximately eight months. [Petitioner] was housed in the Module 121 disciplinary unit. Each cell in that unit is for one individual and has no windows. The cell has a tray slot and a solid door with a porthole window. The inmates in that module are not allowed visits or telephone calls. Trustees clean trash inside the cells only in the absence of the inmate housed there and under the supervision of a deputy. Inmates' cells are usually searched when they are either taking a shower or out to court. Any contraband or weapons are removed from the cell following the search. Contraband had previously been found in [petitioner's] cell.

Deputy Wargo worked in the Twin Towers jail during [petitioner's] incarceration in Module 121. Deputy Wargo dealt with [petitioner] on a daily basis. [Petitioner] threatened Deputy Wargo at least a couple of times each week. On August 23, 2005, Deputy Wargo was standing inside the module officer's booth when [petitioner] pressed the emergency intercom button. Deputy Wargo responded to [petitioner]. [Petitioner] was asked what he needed. [Petitioner] asked who was speaking. Deputy Wargo identified himself. [Petitioner] asked if Deputy Wargo was alone. Deputy Wargo said he was alone. [Petitioner] the[n] said he was going to court later in the week. [Petitioner] said he would use the phone in the court lockup to call his "homies" to obtain information from the Department of Motor Vehicles. The information would reveal Deputy Wargo's address and automobile registration. Deputy Wargo knew that [petitioner] was a member of a local criminal street gang. Deputy Wargo understood the term "homies" to be fellow gang members. [Petitioner] also said he would have his "homies" wait outside the jail. The gang members would follow Deputy Wargo home and then kill him. [Petitioner] said the gang members would also kill Deputy Wargo's family. Deputy Wargo testified, "He stated that he hated me." Deputy Wargo also testified: "He stated that he was going to have the homies, once again, go to my house, shoot me with a 12–guage shotgun, blow my head off, make sure I had a closed casket funeral. [¶] He stated he was going to have the homies run a train—have sex, with my wife. He was going to molest my kids. He was, in fact, going to also rape my wife."

Deputy Wargo described other threat related statements: "He stated for me to check his records, call Chino. Call his parole officer." [Petitioner] made reference to his gang moniker and affiliation. Deputy Wargo was aware that a correctional officer had been killed at Chino state prison earlier that year by another local criminal gang member. [Petitioner] mentioned the killing of the correctional officer to Deputy Wargo on several occasions. [Petitioner] also said he had been in a fight in the court lockup area the week before. Deputy Wargo testified, "He stated that while he was fighting this inmate, he pictured the inmate to be me and, in essence, wanted to kill me." Deputy Wargo was afraid for his life and those of his family members. [Petitioner] had previously threatened Deputy Wargo. But, the prior threats were not as detailed as those made on August 23, 2005. As a

denied, —— U.S. ——, 129 S.Ct. 926, 173 L.Ed.2d 132 (2009); *Slovik v. Yates,* 556 F.3d 747, 749 n. 1 (9th Cir.2009).

result of those threats, Deputy Wargo notified his superiors at the jail and family members. Deputy Wargo altered his routines by doing such things as: being cognizant of his surroundings at all times; taking different routes home; and, circling his house prior to parking and going inside.

On September 13, 2005, [petitioner] refused to get ready to go to court. [Petitioner] demanded to speak to a sergeant. [Petitioner] was "extremely irate and just very adamant" about the fact that he did not want to go to court. Deputy Coss and the sergeant spoke with [petitioner]. It was then determined that [petitioner] would not be transported to court. Deputy Coss left [petitioner's] cell. [Petitioner] then said, " 'You need to worry about 245 on deputy sheriff . . . with this motherfucken knife I have.' " Deputy Coss was aware that a "245" is the Penal Code section for assault with a deadly weapon. Deputy Coss returned to his booth. Deputy Coss turned on the intercom inside [petitioner's] cell. Deputy Coss overheard [petitioner] speaking to an adjacent inmate. [Petitioner] said that he was going to slash the first deputy that entered his cell. [Petitioner] sounded serious. [Petitioner] was boasting that he would slash a deputy. Deputy Coss returned to [petitioner's] cell. [Petitioner] was standing in the back of his cell when Deputy Coss looked into the window. [Petitioner] had removed his identification wristband. [Petitioner] was asked what he had done with the metal clasp to the wristband. [Petitioner] said he flushed it down the toilet. [Petitioner] then reached underneath his metal bunk and pulled out a small razor blade with a handle attached. [Petitioner] said, " 'You need to worry about this, you know, not no little metal clasp.' " [Petitioner] made a slashing motion back and forth. [Petitioner] said, " 'This mother-

fucker is for Deputy Wargo.' " Deputy Coss ordered [petitioner] to hand over the razor blade several times. [Petitioner] ultimately slid the razor under the door. [Petitioner] said: " 'I got that one at court. I will get another one at court.' " Deputy Coss notified Deputy Wargo about [petitioner's] threats. [Petitioner] was not allowed to have a disposable razor in the disciplinary module. The razor in [petitioner's] possession was a "shank" or jail-made knife or stabbing device.

Deputy Patino also worked at the Twin Towers jail. Deputy Patino was familiar with [petitioner]. At approximately 4:50 p.m. on September 13, 2005, Deputy Patino conducted a routine search of [petitioner's] person. This occurred when [petitioner] returned to the jail from a court appearance. Deputy Patino removed excessive food and hygiene materials from [petitioner] because they constituted contraband. [Petitioner] became angry and responded to Deputy Patino's seizure of the food and hygiene materials, "He started telling me that he knew it was a plot and told me that it was his stuff and that he was going to get me back." [Petitioner] was returned to his cell. Deputy Patino heard a loud bang coming from the direction of the cell. Deputy Patino walked to the cell to conduct a security check. [Petitioner] called out, " 'Hey, Patino, is that you?' " Deputy Patino replied. [Petitioner] the[n] asked Deputy Patino to come over to the cell. Deputy Patino remained outside the cell. Deputy Patino described what happened upon arriving at [petitioner's] cell: "He started threatening my life. [¶] . . . He started telling me that he was going to kill me, that he knew people, he could get my name, my address, what kind of vehicle I drove. [¶] . . . He made reference to another inmate that we had had in our

custody and had told me he was going to do the same thing that that inmate supposedly did to a prison guard upstate." [Petitioner] claimed he could get this personal information from Department of Motor Vehicles employees. The killing of a prison guard was in reference to the stabbing of a correctional officer in Chino. The inmate involved in the killing of the prison guard was a member of the same gang as [petitioner]. Deputy Patino described the words used by [petitioner], "He said he was going to slice me up like the pig that I am, and he was making [slicing] motions with his arm."

[Petitioner] claimed to know Deputy Patino's work schedule. Deputy Patino described [petitioner's] threats in this regard thusly: "[H]e had people that would wait for me at my house. [¶] . . . When I got out of work that he would have somebody waiting for me outside my house on my return." [Petitioner] threatened to have the attack occur on September 27. Deputy Patino testified, "He told me that to make sure I kiss them goodbye on that day because it's the last time I would be seeing them." During this interaction, [petitioner] would refer to his gang affiliation and display his tattoos.

Deputy Patino was afraid for his life and the safety of his family following these threats. Deputy Patino was particularly concerned about [petitioner's] reference to the Department of Motor Vehicles. Deputy Patino was also worried about the threat to have somebody waiting outside for him. Deputy Patino began taking different routes while driving home. Deputy Patino was aware of the similar threats that [petitioner] had made to Deputy Wargo. Deputy Patino heard [petitioner] threaten Deputy Wargo. [Petitioner] seemed serious while making those threats. Deputy Patino was concerned for Deputy Wargo's safe-

ty. Deputy Patino had heard of reports of Department of Motor Vehicles employees selling identity information. When questioned by the prosecutor, Deputy Patino testified:

"Q. Did you think he might be able to get your information from [the] D.M.V.? [¶] A. Yes."

The inmates in the disciplinary unit were required to lay face down on their bunk away from the door when their food was delivered. On September 14, 2005, Deputy Wargo delivered [petitioner's] food. Deputy Wargo placed [petitioner's] food tray inside the cell. [Petitioner] then made a motion as though he was getting up from the bunk. As Deputy Wargo closed the door, [petitioner] "rushed the door." September 14, 2005, was the day after Deputy Coss secured the shank from [petitioner]. On that same day, Deputy Wargo and Deputy Patino approached [petitioner's] cell. Deputy Wargo testified [petitioner] said: "Yeah, I gave the razor to Coss today. [¶] . . . He stated that the razor was for me . . . and Patino." Deputy Wargo described [petitioner's] next statement: "He stated he was going to kill me, and he didn't care. My partners could come in, all they would do is just . . . beat his ass, but he would be pissing on my grave." Deputy Wargo feared for his life at that time and continued to do so at trial. This is because [petitioner] was a member of a powerful street gang. [Petitioner] threatened Deputy Wargo on a daily basis.

On October 21, 2005, [petitioner] was being escorted back to his cell after a court appearance. [Petitioner] was accompanied by Deputies Wargo and Patino. As they walked through a sliding security door, [petitioner] lunged and banged his back against the wall. [Petitioner] then sat down. [Petitioner] began yelling, " 'Oh, you have done it now,

you have done it now.'" [Petitioner] was handcuffed with a waist chain, but the deputies were not holding on to him. Other inmates could see and hear what was happening. [Petitioner] yelled something like, "I told you not to put your hands on me." [Petitioner] said he could not move. [Petitioner] wanted a sergeant to be present and to be taken to the clinic. The deputies called for a supervisor several times. However, no one arrived for at least five minutes because of a shift change. In the interim, [petitioner] was instructed to get up. [Petitioner] did not comply. [Petitioner] started laughing saying, " '$1 million, $1[ ] million.'" Deputy Wargo described what the reference to $1 million meant, "That he was going to sue us for $1 million." [Petitioner] then kicked the middle of Deputy Wargo's leg. Eventually, [petitioner] fought until a number of other deputies arrived and pepper spray was used to subdue him.

Deputy Ben–Sahile worked in the Twin Towers jail in the high-powered Module 132. Inmates housed there are separated from all other inmates and require special precautions when deputies have dealings with them. The inmates in that module are considered to be more dangerous. Deputy Ben–Sahile was instructed to have a sergeant present with a taser before opening [petitioner's] cell door for any reason. Deputies must exercise more caution with all inmates in Module 132. At approximately 7 p.m. on October 27, 2005, [petitioner] began banging on the glass in his cell door. Deputies Ben–Sahile and Banuelos went to defendant's cell door. [Petitioner] continued to bang on the glass and yell. Deputy Ben–Sahile told defendant to stop banging and yelling obscenities. Deputy Ben–Sahile testified [petitioner] responded, "[H]e stated to me that the first chance that he gets he's going to attack me." Also, Deputy Ben–Sahile

testified [petitioner] said: "He said he was going to get his peep's after me. [¶] . . . [H]e said that the first chance he's going to get he's going to shank me and other deputies." Further, [petitioner] threatened to kill Deputies Ben–Sahile, Wargo, Patino, Coss, Banuelos, and Carmona. [Petitioner] said, " 'I am going to have them killed, I am going to kill them.'" [Petitioner] also said that he knew how to manipulate the doors and he planned to "shank" staff. Deputy Ben–Sahile was afraid for his personal safety at the time and continued to be so at the time of trial. One of the factors creating this fear was [petitioner's] gang affiliation. The other 15 inmates in the module reacted by banging on the glass too. [Petitioner] was later removed from that cell because the door was fatigued. The locking mechanism would no longer lock. Deputy Ben–Sahile notified Deputies Patino, Wargo, Coss, and Carmona about [petitioner's] threats.

[Petitioner] told Deputy Ben–Sahile about an inmate at the state prison at Chino. [Petitioner] claimed to have "trained" the inmate. This statement was made after that inmate had killed a correctional officer in Chino. That caused Deputy Ben–Sahile to be more afraid. Deputy Ben–Sahile learned that [petitioner] was found with a shank after leaving Module 132.

Deputy Ben–Sahile was aware that inmates often obtained contraband from other inmates when they traveled to and from court appearances. In addition, inmates verbally communicate with other inmates in the module when they are out of their cells for a shower or other purposes. The inmates also pass things under the gap in the cell doors. An inmate could pass a message to someone outside the jail by having another inmate make a telephone call for them.

Messages can also be relayed at the time of visiting. Deputy Ben–Sahile described his fears thusly, "[H]e could tell somebody, his peep's or people out on the streets to come and find me and attack me or my partners or he could have another inmate do it."

Deputy Carmona was informed by Deputy Ben–Sahile of [petitioner's] threats. Deputy Carmona was fearful of [petitioner]. In the past, [petitioner] had made references that he belonged to a local gang. [Petitioner] stated that another member of the local gang had killed a prison guard. Thereafter, between October 27, 2005 and November 3, 2005, [petitioner] repeated his ability to get access to Department of Motor Vehicles information. [Petitioner] threatened to kill Deputy Carmona. Deputy Carmona feared for his safety. At the time of trial, Deputy Carmona remained afraid of [petitioner]. Deputy Carmona was aware that inmates often brought contraband back from court, which they acquired from other inmates. Deputy Carmona was familiar with the practice of "fishing" wherein inmates pass items from one cell to another. Deputy Carmona was also aware that inmates often requested other inmates make phone calls for them.

[Petitioner] testified on his own behalf. On cross-examination, the prosecutor introduced a tape recording of [petitioner's] statements made to different deputies on various dates, which was played for the jury at trial. A transcript of the tape was also distributed to the jurors. In the tape [petitioner] said: "You got a vest on? Huh? ... You ain't got no vest on that head. [¶] ... [¶] Stay out of the street, homie. Do that on the street. My homies do home invasions, carjackings. My homies. For a little bit of nothing.... Think about it. Just think about it. Shot caller. Big baller. Big baler. Shot caller. You know what I mean? ... It's kind of amazing for me to be so loved, to be so recognized, and have so much power in jail and on the street.... Everybody on the bus listen to me. And they write names and numbers down, homie. That's all they do. Make phone calls.... Oh no, I'll fuck y'all up. Watch, when I come in here with that band-aid on. I been abused. You fucked me up on the way to the shower, remember? ... [¶] Snap your motherfucking neck. And I'll go to sleep feeling good. I'll show you. I'm gonna find out where you (unintelligible). I'm gonna find out. I'm gonna find out your real name too. I ain't gonna sleep until I do. [¶] I love going to court. I got people on the bus. They make phone calls for me, nigger. You know what I mean? ... Y'all gonna keep me away from the phones and visits. I got my ways. You know what I mean? I got my ways to get my shit out. [¶] ... [¶] Let me go to your house while you're at work, when your wife and kids at home. And then when you come home, let me make a (unintelligible). That's the game I want to play, for fucking with me. I'm going to show you the game I play when I get on the street. [¶] ... [¶] ... I put a police in a coma in 1996.... [¶] ... [¶] But what you gonna do? ... You don't have no vest on that head. Huh? ... I trained Psycho to kill, nigger. That's why my name popped up at Chino.... [¶] ... [¶][H]is wife and ... y'all kids while you doing this sixteen hours a day. It's only 24 hours a day. I know y'all live an hour and a half, two hours away from here. Y'all don't get nowhere. [¶] ... We killing motherfucking co's. And some of you deputies smell just like cos. [¶] ... [¶] What, you got a vest on? Huh? ... at work. In the jail house with a vest. I bet you don't wear that uniform on the street, like you do in here. You take that shit off. Don't

you? You change, huh? Probably put a hat on, glasses, huh? Be paranoid as a motherfucker. Be paranoid! What if I see you in a dark alley, just me and you? .... [¶] Cause I'll eat your ass up. I'll eat you up ... like Tyson did Holifield. I'll bite your ear off." [Petitioner] admitted: the reference to the absence of a vest on a deputy's head was made to Deputy Ben–Sahile; the references to carjackings, home invasion robberies, and snapping a deputy's neck were made to Deputy Wargo; and the threat to go to a deputy's home while he was at work was made to Deputy Coss. [Petitioner] said to Deputy Coss, " 'While you at work doing 16 hours, I be at home making love to your kids-to your wife and playing with your kids, my step-kids.' " At another point while being cross-examined about statements to Deputy Wargo, the following occurred: "Q. Why did you tell him, 'You don't have a vest on you head'? [¶] A. Because, like I say, ma'am, I did tell him 'jab, jab, jab, I am going to hit it.' [¶] Q. So you're talking to him about not having a bullet-proof vest on his head because you're going to hit him with your fist? [¶] A. Yeah." [Petitioner] further acknowledged telling Deputy Wargo, " 'Be paranoid as a motherfucker, be paranoid.' " In one portion of the tape, [petitioner] made a motion across his throat toward Deputy Lamb.

*Mosley*, 155 Cal.App.4th at 316–22, 65 Cal. Rptr.3d at 857–63 (footnote omitted).

## III

On July 2, 2008, petitioner, a state inmate proceeding pro se, filed a habeas corpus petition under 28 U.S.C. § 2254, and on August 28, 2008, respondent filed a motion to dismiss the petition, arguing the petition was a "mixed" petition. The petitioner did not file an opposition to the motion to dismiss; rather, on November 4, 2008, he filed a request for a stay of these proceedings to exhaust the unexhausted claim, Ground Two. On December 3, 2008, respondent filed an opposition to petitioner's motion for a stay, and petitioner did not file a reply. On December 18, 2008, this Court found the initial petition to be a "mixed" petition containing an unexhausted claim, Ground Two, and on January 5, 2009, petitioner filed a request to strike Ground Two, which the Court granted. On January 21, 2009, respondent filed his answer, and on April 1, 2009, petitioner filed his reply.

The pending habeas corpus petition raises the sole claim that "Petition[er's] 14 Amendment [right] was violated [when] [t]he evidence was in sufficient [sic] to support a guilty verdict on count[s] 2, 5, 8 [and] 9 [because] the convictions was [sic] base[d] souly [sic] on the testimony of the officers.... " (Petition at 5).

## IV

The petitioner's claims must be considered in light of the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), which "circumscribes a federal habeas court's review of a state court decision." *Lockyer v. Andrade*, 538 U.S. 63, 70, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003); *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534, 156 L.Ed.2d 471 (2003). As amended by the AEDPA, 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—[¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or [¶] (2) resulted in

a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, under the AEDPA, a federal court shall presume that the state court's determination of factual issues is correct, and petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

■ The California Supreme Court addressed petitioner's claim when it denied his petition for review without comment. *Gaston v. Palmer,* 417 F.3d 1030, 1038 (9th Cir.2005), *amended by,* 447 F.3d 1165 (9th Cir.2006), *cert. denied,* 549 U.S. 1134, 127 S.Ct. 979, 166 L.Ed.2d 742 (2007); *Hunter v. Aispuro,* 982 F.2d 344, 348 (9th Cir. 1992), *cert. denied,* 510 U.S. 887, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 2594, 115 L.Ed.2d 706 (1991); *Medley v. Runnels,* 506 F.3d 857, 862 (9th Cir.2007) (en banc), *cert. denied,* —— U.S. ——, 128 S.Ct. 1878, 170 L.Ed.2d 754 (2008). Thus, in addressing Ground One, this Court will consider the reasoned decision of the California Court of Appeal denying that claim on the merits. *Butler v. Curry,* 528 F.3d 624, 640 (9th Cir.), *cert. denied,* —— U.S. ——, 129 S.Ct. 767, 172 L.Ed.2d 763 (2008); *Delgadillo v. Woodford,* 527 F.3d 919, 925 (9th Cir.2008).

## V

■ To review the sufficiency of the evidence in a habeas corpus proceeding, the Court must determine whether " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Lewis v. Jeffers,* 497 U.S. 764, 781, 110 S.Ct. 3092, 3102–03, 111 L.Ed.2d 606 (1990) (citation omitted); *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). All evidence must be considered in the light most favorable to the prosecution, *Lewis,* 497 U.S. at 782, 110 S.Ct. at 3103; *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789, and if the facts support conflicting inferences, reviewing courts "must presume— even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson,* 443 U.S. at 326, 99 S.Ct. at 2793; *Bruce v. Terhune,* 376 F.3d 950, 957 (9th Cir.2004) (per curiam). Furthermore, under the AEDPA, federal courts must "apply the standards of *Jackson* with an additional layer of deference." *Juan H. v. Allen,* 408 F.3d 1262, 1274 (9th Cir.2005), *cert. denied,* 546 U.S. 1137, 126 S.Ct. 1142, 163 L.Ed.2d 1000 (2006). These standards are applied to the substantive elements of the criminal offenses under state law. *Jackson,* 443 U.S. at 324 n. 16, 99 S.Ct. at 2792 n. 16; *Chein v. Shumsky,* 373 F.3d 978, 983 (9th Cir.) (en banc), *cert. denied,* 543 U.S. 956, 125 S.Ct. 415, 160 L.Ed.2d 318 (2004).

The petitioner was convicted in counts 2, 5, 8 and 9 of violating P.C. § 422, which makes it a crime to threaten another person with death or great bodily harm, as follows:

Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is to be made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of

purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison.

P.C. § 422. To prove the crime of making criminal threats, the prosecution must establish all of the following:

(1) that the defendant willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person, (2) that the defendant made the threat with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, (3) that the threat—which may be made verbally, in writing, or by means of an electronic communication device—was on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, (4) that the threat actually caused the person threatened to be in sustained fear for his or her own safety or for his or her immediate family's safety, and (5) that the threatened person's fear was reasonabl[e] under the circumstances.

*People v. Toledo,* 26 Cal.4th 221, 227–28, 109 Cal.Rptr.2d 315, 320, 26 P.3d 1051 (2001) (internal quotation marks and citation omitted); *In re George T.,* 33 Cal.4th 620, 630, 16 Cal.Rptr.3d 61, 67–68, 93 P.3d 1007 (2004).

■■■ "In enacting [P.C.] section 422 . . ., the Legislature declared that every person has the right to be protected from fear and intimidation." *People v. Martinez,* 53 Cal.App.4th 1212, 1221, 62 Cal.Rtpr.2d 303 (1997); *People v. Solis,* 90

Cal.App.4th 1002, 1013, 109 Cal.Rptr.2d 464 (2001). "A criminal threat is the communication of an intent to inflict death or great bodily injury on another with the intent to cause the listener to believe death or great bodily injury will be inflicted on the person or a member of the person's immediate family." *People v. Maciel,* 113 Cal.App.4th 679, 683, 6 Cal.Rptr.3d 628 (2003) (citing *Toledo,* 26 Cal.4th at 233, 109 Cal.Rptr.2d at 325, 26 P.3d 1051). "[T]he communication must be sufficient 'on its face and under the circumstances in which it is made' to constitute a criminal threat. This means that the communication and the surrounding circumstances are to be considered together." *In re Ryan D.,* 100 Cal.App.4th 854, 860, 123 Cal.Rptr.2d 193 (2002); *People v. Butler,* 85 Cal.App.4th 745, 753–54, 102 Cal.Rptr.2d 269 (2000). Moreover, the prosecution must show that the victim feared the defendant, and this "element has both an objective and subjective component; [the victim's] fear must have been reasonable, and it must have been real." *People v. Ortiz,* 101 Cal. App.4th 410, 417, 124 Cal.Rptr.2d 92 (2002); *In re Ricky T,* 87 Cal.App.4th 1132, 1139–40, 105 Cal.Rptr.2d 165 (2001). "The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear." *People v. Allen,* 33 Cal.App.4th 1149, 1156, 40 Cal.Rptr.2d 7 (1995) (citing *People v. Garrett,* 30 Cal.App.4th 962, 967, 36 Cal.Rptr.2d 33 (1994)).

The California Court of Appeal, in affirming petitioner's convictions, denied petitioner's insufficiency of evidence claim, stating:

[Petitioner] argues that there was insufficient evidence as to the "immediate prospect of execution" and "sustained fear" as to the counts in question because at the time he made the threats he was "an inmate housed in a segregated module." [Petitioner] argues that the

criminal threats involved deputies assigned to the high security module who were in contact with him daily and knew him to be disruptive. In addition, [petitioner] argues that the threats related to counts 5, 8, and 9 were all made on the same day to Deputy Ben–Sahile[,] who communicated them to Deputies Coss and Carmona. [Petitioner] reasons: "Although [Deputies] Ben–Sahile, Coss and Carmona may have disliked [defendant] and were angered by his words, there is insufficient evidence the alleged 'threat' was so unequivocal, immediate, and specific as to convey to the deputies an immediate prospect of execution of the threat causing them to be in sustained fear for their safety or their family's safety." We disagree.

\*      \*      \*

... [Petitioner] does not deny that he made the threats. Rather, he attempts to minimize their significance by pointing out that he was known as a difficult inmate and the deputies were in control of his confinement and limited movement. However, in each instance, the deputies were placed in fear because of [petitioner's] ability to obtain weapons as well as his "connections" in the gang within the community. On September 13, 2005, Deputy Coss found [petitioner] in possession of a prison-made shank in the form of a modified razor. Later that same day, Deputy Patino conducted a routine search of [petitioner]. This occurred following [petitioner's] return from a court appearance. Deputy Patino removed contraband from [petitioner's] possession. [Petitioner] became irate. Deputy Patino walked over to [petitioner's] cell. Deputy Patino described what happened next, "He started telling me that he was going to kill me, that he knew people, that he could get my name, my address, what kind of vehicle I drove." [Petitioner] made reference to the fellow gang member who

had killed a correctional officer in Chino. [Petitioner] threatened to cut up Deputy Patino like a "pig." [Petitioner] made slashing motions across his body as he spoke. [Petitioner] claimed to know Deputy Patino's schedule. [Petitioner] also threatened to have people wait at Deputy Patino's residence. [Petitioner] removed his shirt and pointed to his gang-related tattoos, repeating the name of the gang several times. [Petitioner] later attacked Deputy Patino on October 21, 2005. This followed [petitioner's] court appearance. There was substantial evidence that [petitioner's] threats toward Deputy Patino were unequivocal, unconditional, immediate, and specific with an immediate prospect of execution. Deputy Patino remained fearful when he testified at trial in this case. After the foregoing threats were made, Deputy Patino regularly checked his rear view mirror several times when leaving the parking lot after work, checked nearby automobiles, and exited before or after his regular freeway exit to be certain no one was following him.

The same is true for the threats made on October 27, 2005, against Deputies Ben–Sahile, Coss, and Carmona. Defendant threatened to kill Deputies Ben–Sahile, Wargo, Patino, Coss, Banuelos, and Carmona. [Petitioner] told Deputy Ben–Sahile, " 'I am going to have them killed, I am going to kill them.' " [Petitioner] also said that he knew how to manipulate the doors and he planned to "shank" staff. The door to [petitioner's] cell was soon thereafter found to be "fatigued" where the locking mechanism was located, preventing it from being locked. Deputy Ben–Sahile notified Deputies Patino, Wargo, Coss, and Carmona about [petitioner's] threats to kill them. [Petitioner] also told Deputy Ben–Sahile about another inmate at the state prison at Chino who killed a cor-

rectional officer. [Petitioner] claimed to have "trained" the killer. Deputy Ben–Sahile was aware that the inmate [petitioner] mentioned had killed a correctional officer. The correctional officer had been stabbed to death.

Deputy Ben–Sahile also spoke to Deputy Carmona. Deputy Ben–Sahile relayed [petitioner's] threats to kill Deputy Carmona. Deputy Carmona had knowledge of [petitioner's] gang affiliation and references to another inmate's murder of a prison guard. This made Deputy Carmona very fearful. Between October 27, 2005, and November 3, 2005, [petitioner] spoke to Deputy Carmona. [Petitioner] said he had "people" at the Department of Motor Vehicles. These employees could look up Deputy Carmona's personal information. This information would permit [petitioner] to kill Deputy Carmona after being released. Deputy Carmona was still afraid of [petitioner] at the time of trial.

Deputy Coss was familiar with [petitioner's] possession of a jail-made shank. On September 13, 2005, Deputy Coss activated the intercom in [petitioner's] cell. Deputy Coss overheard [petitioner] speaking to an inmate in an adjacent cell. Deputy Coss testified, "He was bo[a]sting that he was going to slash the first deputy that entered his cell." Deputy Coss then saw [petitioner] with a jail-made shank. [Petitioner] was standing in his cell with the shank. [Petitioner] said, " 'You need to worry about this, you know, not no little metal clasp.' " [Petitioner] made a slashing motion back and forth. [Petitioner] ultimately slid the razor under the door. [Petitioner] said: " 'I got that one at court. I will get another one at court.' " Based on all of the facts, the jury could reasonably find [petitioner's] threats against Deputy Coss were unequivocal, immediate, and specific. Further, given the nature of these threats, they conveyed to Deputy Coss an immediate prospect of execution causing him to be in sustained fear for his safety.

*Mosley,* 155 Cal.App.4th at 323–26, 65 Cal. Rptr.3d at 864–66.

Petitioner contends his convictions on counts 2, 5, 8 and 9[2] are not supported by substantial evidence because each conviction relied solely on testimony from the victims of the threats. That is, each deputy who was the victim of a threat testified concerning the nature of the threat made and the deputy's reaction to the threat. *See,* e.g., Reporter's Transcript at 962:17–986:5, 1202:24–1227:10, 1270:20–1276:27, 1294:20–1315:5. Petitioner's claim is specious since the testimony of a single witness is sufficient to uphold a conviction. *Bruce,* 376 F.3d at 957–58; *United States v. Larios,* 640 F.2d 938, 940 (9th Cir.1981). Moreover, a federal court in a habeas corpus proceeding cannot redetermine the credibility of witnesses when the demeanor of the witnesses was not observed by the federal court. *Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983). Rather, "[t]he reviewing court must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Jones v. Wood,* 114 F.3d 1002,

2. As pleaded in the information: count 2 involved a criminal threat against Deputy Patino on September 13, 2005; count 5 involved a criminal threat against Deputy Ben–Sahile on October 27, 2005; count 8 involved a criminal threat against Deputy J. Coss on October 27, 2005; and count 9 involved a criminal threat against defendant Carmona on October 27, 2005. CT 146–54.

1008 (9th Cir.1997) (quoting *Walters v. Maass,* 45 F.3d 1355, 1358 (9th Cir.1995)).

■ Considering the factors set forth in *Toledo,* the Court finds there is substantial evidence to support petitioner's convictions of violating P.C. § 422 as to each of counts 2, 5, 8 and 9. As the California Court of Appeal explained, the evidence showed that on September 13, 2005, Deputy Patino conducted a routine search of petitioner, who had returned to jail from a court appearance, and confiscated as contraband excessive food and other items. The petitioner became angry and told Deputy Patino that he "was going to get [him] back." He then threatened Deputy Patino's life, stating he could get his name and address and vehicle information from people he knew at DMV and that the inmate involved in killing a prison guard in Chino was a member of petitioner's gang. Petitioner claimed to know Deputy Patino's work schedule and stated he had people who would wait for Deputy Patino outside of work at his house when he returned home. Petitioner also threatened to "slice [Deputy Patino] up like [a] pig" while "making [slicing] motions with his arm[,]" and threatened to have the attack occur on September 27. On September 13, 2005, Deputy Coss seized a shank or razor from petitioner, and the next day petitioner said the razor was for Deputies Wargo and Patino. The petitioner then threatened to kill Deputy Wargo. Deputy Patino was afraid for himself and his family after petitioner's threats.

On October 27, 2005, petitioner told Deputy Ben–Sahile that he was "going to attack" him and have his associates go after him. He further stated he was "going to shank [Deputy Ben–Sahile] and other deputies." The petitioner specifically threatened to kill Deputies Ben–Sahile, Carmona, Patino, Coss and others and said that "he knew how to manipulate the doors and planned to 'shank' staff." In fact,

petitioner was later moved out of a cell because the "door was fatigued" and "[t]he locking mechanism would no longer lock." Deputy Ben–Sahile notified Deputies Patino, Wargo, Coss and others about petitioner's threats to them. Additionally, petitioner boasted to Deputy Ben–Sahile that he had "trained" the inmate at Chino who had murdered a prison guard. The petitioner's membership in a local gang that had members outside the jail was part of the circumstances that caused the deputies to treat petitioner's threats as grave threats, as well as finding petitioner with a shank and other contraband, which showed he had no trouble obtaining contraband in jail. The deputies were reasonably afraid for their personal safety following petitioner's threats. All of these factors show that the willful threats from petitioner were intended to be taken as threats, were unequivocal, unconditional, immediate and specific, and the deputies had both subjective and reasonable grounds to be fearful for their safety in light of knowing who petitioner was, his gang membership, the availability of contraband to him, and what happened to the prison guard in Chino. Thus, there is no merit to petitioner's claim that there was insufficient evidence to support his convictions on counts 2, 5, 8 and 9 for violating P.C. § 422. *People v. Gaut,* 95 Cal.App.4th 1425, 1431–32, 115 Cal.Rptr.2d 924 (2002); *People v. Franz,* 88 Cal.App.4th 1426, 1446–49, 106 Cal. Rptr.2d 773 (2001); *see also Elder v. Walker,* 2008 WL 2397478, *5 (E.D.Cal. 2008) (sufficient evidence supported inmate's conviction for making criminal threat against correctional officer where inmate threatened to "snuff" correctional officer and mentioned the previous murder of correctional officer who was stabbed to death in prison, since correctional officer took threat seriously and was afraid for his and his family's safety in light of inmate's "present ability to carry out the threat . . .

[as] 'inmates in high security facilities have killed correctional officers in the past.'" (citation omitted)).

Accordingly, the California Supreme Court's denial of Ground One is neither contrary to, nor an unreasonable application of, clearly established federal law, within the meaning of 28 U.S.C. § 2254(d).

### RECOMMENDATION

IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law herein; and (3) directing that Judgment be entered denying the petition and dismissing the action with prejudice.

DATE: April 27, 2009.