Filed 7/22/16  P. v. Garcia CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050169 |
| v. | (Super. Ct. No. 13WF0966) |
| DAVID RAYMOND GARCIA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John L. Flynn, Judge.  Affirmed in part and reversed in part.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

INTRODUCTION

Defendant David Raymond Garcia appeals after a jury found him guilty of two felony counts of making criminal threats, one felony count of driving under the influence of alcohol or drugs with a prior felony, one felony count of driving with a blood-alcohol level of 0.08 percent or more with a prior felony, two misdemeanor counts of hit and run with property damage, and one misdemeanor count of resisting a peace officer. Garcia argues that, aside from his conviction for the misdemeanor offense of resisting a peace officer, none of his convictions was supported by substantial evidence.

We affirm the judgment except for Garcia's conviction for one of the two misdemeanor counts of hit and run with property damage. As the Attorney General acknowledges, under the facts of this case, Garcia may be properly convicted of only one count of hit and run with property damage in violation of Vehicle Code section 20002, subdivision (a). We therefore reverse the judgment as to Garcia's conviction for that offense which was pleaded in the information as count 7. Substantial evidence supported each of Garcia's other convictions.

FACTS

Around 4:00 p.m. on April 1, 2013, Arlette Benitez was being driven to her Garden Grove home by her boyfriend when she heard a "slam." She turned around and saw a large white vehicle traveling in the same lane behind the car she was riding in; she saw the white vehicle hit a curb and then a car. Benitez saw the white vehicle stop, "kind of los[e] control," and then "continue[] going" down the street. Benitez's boyfriend pulled over and parked near some apartments to allow the white vehicle to pass. As the white vehicle passed by, Benitez saw two people inside it.

Benitez's boyfriend resumed driving and pulled into the apartment complex where Benitez lived. Benitez saw the same white vehicle park at the apartment complex. Benitez saw the driver of the white vehicle get out of the vehicle; she got a "good look"

at the driver because he was "[n]ot that far away" from her. She watched him talk to "some guys inside of a garage."

Officers Charlie Danieley, Thomas Capps, and William Holloway of the Garden Grove Police Department were each dispatched to the area in response to a report of a possible hit-and-run collision. After arriving there, Danieley detained two men, Michael Arrellano and Ezekiel Lomelin, who were across the street from the apartment complex. When Holloway arrived, he saw two vehicles in the area, a blue Chevrolet Astro van and a silver Lexus, each of which appeared to have fresh collision damage in a similar pattern; both vehicles were parked "in close proximity to each other" on the street. Holloway started looking for a third vehicle, which, he believed, had been involved in the collision and had been described to him as a white SUV. He rode his police motorcycle through apartment complexes' parking lots and located a white Chevrolet Suburban (the white SUV) with "fresh" collision damage "consistent" with the damage he had seen on the other two vehicles. The white SUV was parked less than a quarter-mile from the site of the collision.

Benitez approached Holloway who then asked Danieley to interview Benitez; Danieley took Benitez's statement. Holloway was also approached by the manager of the apartment complex. Holloway noticed several security cameras throughout the parking lot and asked the manager about them. Holloway then went with the manager into one of the apartments to view the video setup for the six to eight cameras at the apartment complex. The video setup included a high definition, wide-screen monitor that displayed a "very clear picture" and was able to zoom in and look at multiple cameras' views or one camera's view at a time. Holloway watched the video surveillance recording for the time period beginning five minutes prior to his receiving the dispatch call to five minutes after he had received that call. The video recording showed the white SUV enter and drive through the parking lot and park in a parking stall. The video recording showed two individuals get out of the car.

3

Holloway testified that the video recording provided "a good look at the driver." The video recording showed the driver was a Hispanic male wearing a shirt with white and dark-colored stripes, dark shorts, and dark-colored shoes. The video recording showed the driver walking around to the front of the white SUV and looking at the damage. Holloway testified the driver, as shown in the video recording, was Garcia. Holloway further testified he saw on the video recording that the passenger of the white SUV was a Hispanic male who was wearing a burgundy shirt and dark pants. Holloway identified the passenger, depicted in the video recording, as Lomelin. Holloway testified regarding his unsuccessful efforts to obtain a copy of the video recording. The video recording was therefore not introduced or admitted into evidence at trial.

Capps detained Garcia and placed him in handcuffs, after seeing him walk from the area where the white SUV was parked. Capps testified, "[i]t took 10 or 15 minutes to get the information out of [Garcia]." Capps ran an information check on Garcia and learned that there was an active warrant out of Fresno County for Garcia's arrest. Garcia was uncooperative and had to be restrained in the rear seat of Capps's patrol car. Capps saw that Garcia's eyes were bloodshot and watery, and he could smell the odor of an alcoholic beverage emanating from Garcia. Capps found a key to the white SUV in one of Garcia's pockets; the key had the Chevrolet logo on it.

When Holloway returned to site of the collision and made contact with Capps, he saw that three individuals, Lomelin, Arrellano, and Garcia, had been detained. Lomelin and Arrellano were seated on the curb by Capps, and Garcia was in the rear seat of Capps's patrol car.

Danieley had Benitez sit in the backseat of his patrol car to conduct an in-field lineup to see if Benitez could identify the driver and passenger of the white SUV. Benitez was first shown Arrellano and Lomelin. She identified Lomelin as the passenger of the white SUV. She was then shown Garcia who was still seated in the backseat of Capps's patrol car. Holloway and Capps had difficulty getting Garcia out of the patrol

4

car to be better visible to Benitez during the in-field lineup. Garcia refused to voluntarily get out of the patrol car and after Holloway and Capps pulled him out, he refused to stand up, slumped, and put his head down to prevent the possible identification from occurring. He was agitated and aggressive. Within a few seconds of seeing Garcia when he was still inside the patrol car, however, Benitez identified Garcia as the driver of the white SUV.[1] She told Danieley that her identification was based on Garcia's clothing, facial features, and general build. Garcia was placed back in the patrol car; he yelled and cursed at the officers "the whole time."

Like Capps, Holloway observed Garcia showing common symptoms of impairment or intoxication. Holloway smelled a strong odor of an alcoholic beverage on Garcia's breath and saw Garcia had bloodshot, watery eyes and dilated pupils, and noticed Garcia also slurred his speech. Holloway, however, did not go through the standard pre-field sobriety test questions because when he tried to have a conversation with Garcia, he became verbally aggressive; he cursed, yelled, and made unspecified accusations against the officers. Holloway felt it would be unsafe for "everyone there, including the general public," to have Garcia out of the patrol car and unrestrained, performing the field sobriety tests.

Garcia was arrested and transported by Capps in his patrol car to the police station. During the ride, Garcia was "very angry, very aggressive." He told Capps that Capps's wife was going to leave him and that neither Capps nor his wife was going to have a house to live in. He called Capps a bitch several times. Garcia cut his head by slamming it on the partition in the patrol car.

---

[1] Benitez testified that during the in-field lineup, she identified the driver and the passenger of the white SUV. Benitez stated that she recognized the "guy who wouldn't get out of the car" as the driver because she remembered his face and beard. At trial, Benitez testified the driver was Hispanic and was wearing a striped or plaid flannel shirt, jeans, and black Nike shoes. She did not recognize Garcia at trial.

5

When Capps and Garcia arrived in the rear parking lot of the police station, known as the "sally port" area, Garcia had to be helped out of the patrol car and secured on a gurney for transport to a local medical center. Garcia remained combative and cursed at the officers who were present, including Capps and Danieley. At 5:45 p.m., before medical personnel arrived, a licensed phlebotomist obtained a blood sample from Garcia.

After Capps and other officers secured Garcia on the gurney, Garcia stared at Capps with an "angry look," repeated Capps's name five to 10 times, and looked at his name badge. Garcia repeatedly told Capps that Capps's children were going to cry when they do not have him around, and they were going to grow up without him. Garcia repeatedly stated the words "La Eme," which Capps knew referred to the Mexican Mafia. Garcia also told Capps that he belonged to the Fresno Bulldogs, which Capps understood to be a street gang; he noticed Garcia had a bulldog tattoo. Garcia's tone was aggressive and serious. Capps perceived Garcia's statements to be actual, immediate, and credible threats.

Garcia also looked directly at Danieley and at his name badge. He told Danieley that his family was going to miss him. Garcia also identified himself to Danieley as being part of La Eme.

Holloway heard Garcia tell both Capps and Danielely "they should kiss their children good-bye, and it was going to be their fault when their kids were crying." He heard Garcia's multiple references to La Eme and his membership with the Fresno Bulldogs. Garcia did not threaten Holloway.

Garcia was transported via ambulance to the medical center. Garcia maintained the same angry demeanor. At the medical center, Garcia again made statements regarding Capps's children growing up without him and again mentioned La Eme and the Fresno Bulldogs. He told Capps that he had been arrested three separate times with guns and that now Capps knew what Garcia "is about."

6

Garcia later entered into an "apologetic emotional state," in which he apologized for making threats against Capps and his family.

The blood sample, taken from Garcia at 5:45 p.m. on April 1, 2013, was analyzed and found to have a 0.18 percent blood-alcohol concentration.

PROCEDURAL HISTORY

Garcia was charged in an information with (1) resisting and deterring an executive officer, in violation of Penal Code section 69 (count 1); (2) two counts of making criminal threats, in violation of Penal Code section 422, subdivision (a) (counts 2 and 3); (3) driving under the influence of alcohol or drugs with a prior felony within 10 years, in violation of Vehicle Code section 23152, subdivision (a) (count 4); (4) driving with a blood-alcohol level of 0.08 percent or more with a prior felony within 10 years, in violation of Vehicle Code section 23152, subdivision (b) (count 5); and (5) two counts of hit and run with property damage, in violation of Vehicle Code section 20002, subdivision (a) (counts 6 and 7).

The information alleged as to counts 4 and 5 that, pursuant to Vehicle Code section 23578, Garcia "unlawfully had a concentration of alcohol in his/her blood of .15% and more by weight" and he had previously been convicted of violating Vehicle Code section 23153, subdivision (a). The information further alleged that (1) pursuant to Penal Code sections 667, subdivisions (d) and (e)(1) and 1170.12, subdivisions (b) and (c)(1), Garcia had been previously convicted of a serious and violent felony; (2) pursuant to Penal Code section 667.5, subdivision (b), he had served a prior prison term; and (3) pursuant to Penal Code section 667, subdivision (a)(1), he had been convicted of a prior serious felony.

As to count 1, the jury found Garcia guilty of the lesser included offense of misdemeanor resisting a peace officer, in violation of Penal Code section 148, subdivision (a). The jury found him guilty as charged in counts 2 through 7. The jury

7

found the Vehicle Code section 23578 enhancement allegation true as to counts 4 and 5. As to the enhancement allegations, Garcia admitted the truth of "all priors."

The trial court imposed a total prison term of nine years four months. Garcia appealed.

## DISCUSSION

### I.

### STANDARD OF REVIEW

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) The testimony of a single witness, unless physically impossible or inherently improbable, is sufficient to support a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

### II.

### SUBSTANTIAL EVIDENCE SUPPORTED GARCIA'S CONVICTION FOR TWO COUNTS OF MAKING CRIMINAL THREATS, IN VIOLATION OF PENAL CODE SECTION 422, SUBDIVISION (a) (COUNTS 2 AND 3).

Garcia contends his convictions for two counts of making criminal threats, against Capps and Danieley, respectively, were not supported by substantial evidence

because "the evidence was overwhelming that [Garcia] lacked the means of *immediate* execution of the threat." He also argues the evidence was insufficient to show the immediacy and gravity of his threats. Garcia's arguments lack merit.

The California Supreme Court has stated: "[W]e believe it is helpful to divide the crime of criminal threat into five constituent elements that must be established to find that a defendant has committed this offense. In order to prove a violation of [Penal Code] section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, *immediate*, and specific as to convey to the person threatened, a gravity of purpose and *an immediate prospect of execution of the threat*,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228, italics added.)

"'To constitute a criminal threat, a communication need not be *absolutely* unequivocal, unconditional, immediate, and specific. The statute includes the qualifier "so" unequivocal, etc., which establishes that the test is whether, in light of the surrounding circumstances, the communication was *sufficiently* unequivocal, unconditional, immediate, and specific as to convey to the victim a gravity of purpose and immediate prospect of execution.' [Citation.]" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1433.) "'[I]t is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for

9

a violation of [Penal Code] section 422.' [Citation.] The jury is 'free to interpret the words spoken from all of the surrounding circumstances of the case.' [Citation.]" (*Ibid*.)

Capps testified that after he had assisted other officers in placing Garcia on a gurney and strapping him down in preparation of transport to the medical center, Garcia stared at Capps with an angry look, repeated Capps's name five to 10 times, and told Capps that his children were going to cry when they did not have Capps around and they were going to grow up without him. Garcia told Capps that he was a member of the Fresno Bulldogs, which Capps understood to be a street gang out of Fresno. Capps noticed Garcia had a bulldog tattoo. Garcia also repeatedly said the words "La Eme," which is a term used to refer to the Mexican Mafia. Capps testified that the substance of Garcia's statements, coupled with his demeanor while making them, showed Garcia's statements were made in an "aggressive and serious" manner. Capps perceived them as constituting actual, immediate, and credible threats. Capps testified that at the medical center, Garcia again stated Capps's children would grow up without him and referred to La Eme and the Fresno Bulldogs. Garcia also informed Capps that he had been arrested with guns three separate times and told Capps that he now knew what Garcia "is about."

Danieley testified that when he had helped other officers in securing Garcia on the gurney in anticipation of his transport to the medical center, Garcia was extremely aggressive, upset, and belligerent. In that context, Garcia looked directly at Danieley and his name badge and told him that Danieley's family was going to miss him. Garcia identified himself as being part of La Eme which Danieley knew to be a reference to the Mexican Mafia. Garcia also referred to his membership in the Fresno Bulldogs.

Holloway testified he was not personally threatened by Garcia, but corroborated Capps's and Danieley's testimony. Holloway testified: "He told Officer Capps and Officer Danieley they should kiss their children good-bye, and it was going to be their fault when their kids were crying. He made reference to himself being a gang

10

member with the Fresno Bulldogs and said La Eme several times." Holloway further testified that Garcia made those statements in an "[a]ggressive and serious" manner.

Garcia argues the evidence was insufficient to show his threats against Capps and Danieley reflected immediacy, gravity of purpose, or an immediate prospect of execution of the threats. He argues, "taken in the light most favorable to the prosecution, [Garcia] was in custody and in the complete control of law enforcement at the time of the threat. In order for [Garcia] to carry out the alleged . . . threat, he would first have to get out of custody, get a gun, and then find the two officers."

As for the seriousness of Garcia's threats against the officers, more than substantial evidence showed Garcia threatened Capps and Danieley that their families would miss them because they were going to die. Garcia implied that their deaths would be accomplished with the assistance of the Mexican Mafia and the Fresno Bulldogs. Garcia made those statements in the context of "mad dogging" the officers, looking at the name badges, and repeatedly stating their names and the term "La Eme." The record shows Garcia communicated that even if he would be unable to fulfill his threats personally due to any continuing incarceration, his threats could be fulfilled with the assistance of fellow gang members, thereby establishing the immediacy of his threats and an immediate prospect of their execution. Penal Code section 422 does not require that the person making the threats personally fulfill them.

In any event, several cases have upheld convictions for making criminal threats even under circumstances in which the defendant was actually incarcerated and incapable of directly harming the victim at the time the threats were made. (See, e.g., *People v. Wilson* (2010) 186 Cal.App.4th 789, 795 [criminal threat conviction upheld after the defendant threatened to personally kill a corrections officer when he was released on parole in 10 months]; *People v. Mosley* (2007) 155 Cal.App.4th 313, 324-325 [rejecting the defendant's argument evidence was insufficient to prove he made criminal threats because he was incarcerated at the time he threatened sheriff's deputies]; *People*

11

*v. Gaut* (2002) 95 Cal.App.4th 1425, 1427 [upheld criminal threats conviction based on the defendant's threats against his girlfriend even though he was incarcerated at the time].)

More than substantial evidence showed that "'in light of the surrounding circumstances,'" Garcia's threats were "'*sufficiently* unequivocal, unconditional, immediate, and specific as to convey to the victim a gravity of purpose and immediate prospect of execution.' [Citation.]" (*People v. Hamlin*, *supra*, 170 Cal.App.4th at p. 1433.)

III.

SUBSTANTIAL EVIDENCE SUPPORTED GARCIA'S CONVICTIONS FOR DRIVING UNDER THE INFLUENCE OF ALCOHOL OR DRUGS AND DRIVING WITH A BLOOD-ALCOHOL LEVEL OF 0.08 PERCENT OR MORE.

Garcia challenges his convictions for driving under the influence of alcohol or drugs, driving with a blood-alcohol level of 0.08 percent or more, and for leaving the scene of an accident[2] on the ground insufficient evidence showed "he was the driver of the SUV that crashed into the two parked cars." We disagree.

Benitez testified that she saw the white SUV after hearing a slam, saw its two occupants as the white SUV passed the car she was traveling in, watched it park at the apartment complex, and got a "good look" at the driver after he got out of the white SUV and walked to a garage. She further testified that she had identified the driver to the police, following an in-field lineup. She also testified that the person she had identified as the driver was the person who had been seated in a patrol car and who "wouldn't get out of the car." She had told Danieley that she recognized the driver based on his clothing, facial features, and general build.

---

[2] For the reasons discussed *post*, we hold that one of Garcia's two convictions for hit and run with property damage must be reversed.

Capps testified that he had detained Garcia, found the key to the white SUV in Garcia's pocket, and placed Garcia in the rear seat of his patrol car. Capps and Holloway had to pull Garcia out of the patrol car because he refused to voluntarily get out for the in-field lineup. Garcia was the only individual shown to Benitez who was inside a patrol car.

Danieley testified that when Benitez was shown Garcia, while he was still seated in the rear seat of Capps's patrol car, she had identified him as the driver of the white SUV.[3] There was no evidence Benitez's identification of Garcia was equivocal or otherwise unreliable. In fact, Danieley testified, "[s]he made the identification within a few seconds."

Furthermore, Holloway testified that he viewed the surveillance video of the apartment complex's parking lot, which showed the white SUV parking shortly after the collision and then showed Garcia getting out of the white SUV from the driver's door. Holloway also testified the video setup included a high definition, wide-screen monitor which displayed a very clear picture of the driver when he got out of the white SUV.

Notwithstanding Benitez's inability to identify Garcia at trial and inconsistent evidence regarding the exact colors and style of garments worn by the driver, sufficient evidence was presented at trial to establish that Garcia was the driver of the white SUV.[4]

---

[3] In his opening brief, citing page 305 of the reporter's transcript, Garcia argues that Danieley did not testify "in what capacity Ms. Benitez identified [Garcia] at the show-up; i.e., as the driver, as the passenger, as a person she recognized from the apartment complex." But, at page 316 of the reporter's transcript, without any objection by Garcia's counsel, Danieley testified as follows:
"Q  Let's talk about Miss Benitez.  [¶] You said that she identified Mr. Garcia as the driver as he was seated in Officer Capps' patrol car, correct?
"A  Yes."

[4] We note that in his opening brief, Garcia cites the testimony of Hoa Trung Pham stating Pham identified Garcia as the *passenger* of a "grey" van. For the reasons discussed *ante*, sufficient evidence showed Garcia drove the white SUV.

13

## IV.

### SUBSTANTIAL EVIDENCE SUPPORTED GARCIA'S CONVICTION FOR ONLY ONE COUNT OF HIT AND RUN WITH PROPERTY DAMAGE.

Garcia argues that because there was "one accident, one course of conduct," he should have been convicted of only one misdemeanor count of hit and run with property damage, in violation of Vehicle Code section 20002, subdivision (a), instead of being convicted of two misdemeanor counts of that crime, as charged in counts 6 and 7 of the information. He argues that this court must reverse count 7.

Vehicle Code section 20002, subdivision (a) provides: "The driver of any vehicle involved in an accident resulting only in damage to any property, including vehicles, shall immediately stop the vehicle at the nearest location that will not impede traffic or otherwise jeopardize the safety of other motorists. Moving the vehicle in accordance with this subdivision does not affect the question of fault. The driver shall also immediately do either of the following: [¶] (1) Locate and notify the owner or person in charge of that property of the name and address of the driver and owner of the vehicle involved and, upon locating the driver of any other vehicle involved or the owner or person in charge of any damaged property, upon being requested, present his or her driver's license, and vehicle registration, to the other driver, property owner, or person in charge of that property. The information presented shall include the current residence address of the driver and of the registered owner. If the registered owner of an involved vehicle is present at the scene, he or she shall also, upon request, present his or her driver's license information, if available, or other valid identification to the other involved parties. [¶] (2) Leave in a conspicuous place on the vehicle or other property damaged a written notice giving the name and address of the driver and of the owner of the vehicle involved and a statement of the circumstances thereof and shall without unnecessary delay notify the police department of the city wherein the collision occurred

14

or, if the collision occurred in unincorporated territory, the local headquarters of the Department of the California Highway Patrol."

Here, the information does not specify the basis upon which Garcia was charged with two counts of misdemeanor hit and run with property damage. To the extent the counts were based on his colliding with two vehicles, he should not have been charged with two violations of Vehicle Code section 20002, subdivision (a) because the statute is violated by the act of leaving the scene of a collision, not by the act of striking an individual car. (See *People v. Calles* (2012) 209 Cal.App.4th 1200, 1217 [reversing the judgment as to three counts of leaving the scene of an accident in violation of Vehicle Code section 20001, subdivision (a), each of which named a different victim, because "there can be only one conviction for leaving the scene of an accident" when there was only one act of leaving the scene].)

In the respondent's brief, the Attorney General agrees that Garcia should not have been convicted of two misdemeanor counts of hit and run with property damage and that this court should reverse one of those convictions. The Attorney General states: "Respondent agrees that one of [Garcia]'s two convictions for vehicular hit and run, either count six or count seven, should be dismissed. . . . [J]ust as this Court in *People v. Newton* (2007) 155 Cal.App.4th 1000, found the defendant in that case violated Vehicle Code section 20001 [duty to stop at vehicle-caused injury] . . . once, a similar result should occur here. Because [Garcia] collided into two vehicles, parked in close proximity to each other on Garden Grove Boulevard, he violated section 20002 once when he fled and failed to leave his identification on the vehicles."

Because insufficient evidence supported a finding of two separate acts of hit and run with property damage, in violation of Vehicle Code section 20002, subdivision (a), and in light of the Attorney General's agreement on that point, we reverse Garcia's conviction on count 7 of the information.

15

DISPOSITION

Garcia's misdemeanor conviction for hit and run with property damage charged in count 7 of the information is reversed.  In all other respects, the judgment is affirmed.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.